**REPUBLIC GEAR COMPANY,**
Plaintiff-Appellee,

v.

**BORG–WARNER CORPORATION,**
Defendant-Appellant.

No. 16490.

United States Court of Appeals
Seventh Circuit.

Jan. 8, 1969.

Rehearing Denied Feb. 7, 1969.

See also, 2 Cir., 381 F.2d 551.

Charles W. Houchins, James E. S. Baker, Robert L. Jones, Chicago, Ill., Robert W. Murphy, Mark E. MacDonald, Sidley & Austin, Chicago, Ill., of counsel, for appellant.

Edward I. Rothschild, Chicago, Ill., Sidney Bender, New York City, Melvin I. Mishkin, Chicago, Ill., Aaron Lewittes, New York City, Barry Boxer, New York City, Rothschild, Hart, Stevens & Barry, Chicago, Ill., of counsel, for appellee.

Before CASTLE, Chief Judge, KILEY and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Action for inducement of breach of contract.[1]

Plaintiff Republic Gear Company claims that defendant Borg-Warner Corporation induced Maquinas York, a Brazilian sociedade anonima (corporation), to breach an existing contract between Republic and York. Republic was engaged in the sale and distribution of gears for the automobile replacement market in the United States. Most of its gears were manufactured by corporations affiliated with it. York manufactured and sold gears in Brazil. Borg-Warner manufactured and sold transmissions and gears in the United States.

The jury found against Borg-Warner and awarded $400,000 damages. Borg-Warner appealed from the judgment accordingly entered.

Republic and York made a written agreement July 5, 1955. In it Republic granted York a license to manufacture

---

[1] Jurisdiction is founded on diversity of citizenship. The law of Illinois has been accepted as controlling except that the parties disagree whether certain issues are governed by the law of the United States of Brazil.

and sell the Republic line of gears in the United States of Brazil for a term of 15 years. York was given the right to sell under the trade name "Republic" and use the Republic insignia. Republic agreed not to license any other to manufacture in Brazil and to furnish York with manufacturing and quality standard information. York agreed to maintain Republic's standards of quality and to pay a royalty of 5% on all sales of Republic line items manufactured and sold by York in Brazil. York guaranteed a minimum monthly royalty. Payments were to be deposited in Republic's account at a Brazilian bank. There were provisions allowing Republic to terminate, but none allowing termination by York. York agreed not to manufacture or sell any products in the Republic line except under the name "Republic", except for sales to vehicle manufacturers for original equipment. Improvements by either party were to be disclosed to the other.

Republic began to supply information and York began to sell gears under the Republic trade name, and pay royalties. Problems developed, however. York did not pay promptly or in full the amounts of royalty claimed by Republic. York claimed that Republic failed to supply manufacturing information as promptly or as fully as the contract required. There were exchanges of correspondence concerning these claims. There were meetings in December, 1958 and October, 1959 between officers of Republic and York.

On December 1, 1959, York's New York lawyer, Nattier, wrote a letter to Republic's lawyer, enclosing letters from York, addressed to Republic and dated October 22 and November 1. Nattier wrote, "Maquinas York states that it has ceased, as of 30 October 1959 selling gears under the Republic trademark, and regards the license agreement as terminated as of 30 September 1959". As will be seen, there are facts suggesting that just before December 1 York and Borg-Warner had reached an informal agreement for a licensing arrangement, covering transmissions as well as gears.

On March 17, 1960 Borg-Warner and an affiliated corporation made written agreements with Industria Automobilistica Borton, S. A., a Brazilian corporation. By one of the agreements Borg-Warner granted Borton the exclusive right to manufacture Warner gears in Brazil, together with non-exclusive rights such as the use of the Warner trademark. Borton agreed to make a lump sum initial payment and additional payments dependent on the volume of sales. The other agreement was similar, but covered two types of transmission.

Borton was a sociedade anonima or corporation, newly created and chosen by the executives of York to be the licensee in the agreements with Borg-Warner.

There were contacts, and, at times, negotiations, between executives of Borg-Warner and York from time to time in 1955, 1958, and 1959. York was interested in an arrangement concerning manufacture of transmissions in Brazil, items not covered by the Republic agreement. On October 14 or 19, 1959 Borg-Warner proposed an agreement pertaining only to gears. It indicated the license on transmissions was still under study. York prepared its termination letters of October 22 and November 1, but Nattier, York's lawyer, did not deliver them to Republic at that time. On November 17, Borg-Warner's representative wrote to York's lawyer, Nattier, that proceeding with a license on transmissions had been approved. The jury could properly infer that this approval triggered York's repudiation, on December 1, of its agreement with Republic.

Borg-Warner had learned in 1955 that York had an agreement with Republic, valid for 15 years. There was no direct evidence that the Borg-Warner people saw the Republic agreement or were told that it had not been terminated. There was testimony that the York people represented from time to time that the Republic agreement was subject to termination, was about to be terminated, or had been terminated. Admittedly the

Borg-Warner people viewed the Republic agreement as an impediment to a deal between Borg-Warner and York. In 1958, one of the Borg-Warner representatives had written to York "that we would, of course, require that the plant with whom we associated devote itself exclusively to the manufacture of our gears and not supply gears under any other brand."

We shall not attempt a detailed analysis of the facts in the voluminous record. It suffices to say that, interpreting the record most favorably to Republic, the following inferences could reasonably be drawn: York was interested in obtaining the right to manufacture Borg-Warner transmissions in Brazil; Borg-Warner was interested in having Warner gears and transmissions manufactured there; Borg-Warner would not license York to manufacture transmissions without licensing it to manufacture gears and would not do so while York had a license from Republic to manufacture gears; York would not and did not repudiate the Republic agreement until Borg-Warner assured York of gear and transmission licenses; and Borg-Warner knew or was chargeable with knowledge that York had no right to terminate the Republic agreement.

The district court instructed the jury that Republic must prove five propositions and if it failed on any, the verdict should be for Borg-Warner. The five were:

"First, that there was a contract in existence between plaintiff and York at the time of the defendant's act or acts which allegedly constituted the inducement;

"Second, that the defendant knew of the existing contract;

"Third, that the defendant induced York to breach, rescind, or terminate its contract with plaintiff;

"Fourth, that York subsequently breached, rescinded, or terminated its contract with the plaintiff;

"And fifth, and last, that the act or acts of the defendant were a proximate cause of the damage, if any to the plaintiff."

The verdict in favor of Republic must be deemed to embody affirmative findings on each proposition, and we conclude that there was evidence to support each finding.

We shall deal severally with the principal arguments made by Borg-Warner.

1. *Borg-Warner's conduct amounted to "Normal Business Competition".*

This contention, as others made by Borg-Warner, reflects a view of the evidence less favorable to Republic than we are required to take when Republic has won the verdict.

Borg-Warner seems really to be arguing in support of what the Restatement calls the "Privilege of Competitor": "One is privileged purposely to cause a third person not to enter into or continue a business relation with a competitor of the actor if * * *" certain conditions are fulfilled. 4 Restatement, Torts, sec. 768, subsection (1). The case before us has been found by the jury to be one of breach of contract, not simply interruption of a business relation. Subsection (2) goes on to say, "The fact that one is a competitor of another for the business of a third person does not create a privilege to cause the third person to commit a breach of contract with the other even under the conditions stated in Subsection (1)."

2. *Republic failed to prove a "specific deliberate intent to harm the plaintiff and its contract with York. * * *"*

It seems clear that Borg-Warner wanted an agreement with York and anticipated substantial benefit, but would not have agreed to deal if York continued to operate under the Republic contract. Taking the view of the testimony most favorable to Borg-Warner, its people were told and may have believed in good faith that York had the right to terminate the Republic contract and had done so. It is true that there is no direct proof they received contrary information or did not hold that belief. We think,

however, that from all the circumstances, including the importance of the transaction, the care which could reasonably be expected of the executives of a company the size of Borg-Warner, the length of time during which they had successive negotiations with York, and York's open and continued use of the Republic trade name, the jury could reject the testimony of the Borg-Warner people, infer that they were aware of the continued existence of the Republic contract and infer that they conditioned their dealing with York upon York's termination of its relationship with Republic.

There is no reason to suppose that Borg-Warner was motivated by a desire to injure Republic, but ill-will toward the person harmed is not essential.[2]

"The essential thing is the purpose to cause the result. If the actor does not have this purpose, his conduct does not subject him to liability under this rule even if it has the unintended effect of deterring the third person from dealing with the other. It is not necessary, however, that the purpose to cause the breach of contract or failure to deal be the actor's sole or paramount purpose. It is sufficient that he design this result whether because he desires it as an end in itself or because he regards it as a necessary, even if regrettable, means to some other end (See Comment k)."[3]

■ Borg-Warner argues that Illinois decisions require "a design to harm the plaintiff or to take away from the plaintiff some 'benefit' coveted by defendant." Although it has quoted language from Illinois decisions which might suggest a requirement of malice in the sense of ill will or design to harm the plaintiff,[4] this

court has previously quoted with approval the following statement of Illinois law: "The essential elements of this tort [inducement to violate a contract with another] are: (1) defendant's knowledge of the existing contract; (2) the inducement; (3) the subsequent breach by the third person; and (4) damages to the plaintiff."[5] Our study of the Illinois decisions does not lead us to the conclusion that the Illinois law requires a type of intent beyond that which would be incidental to elements (1) and (2), just quoted.

3. *Allegedly erroneous rulings on evidence.*

■ Borg-Warner contends that a number of documents pertaining to negotiations which preceded the formation in 1955 of the agreement between York and Republic should have been admitted. The theory for their relevance is dubious at best. We do not view their exclusion as prejudicial error in any event. We also conclude that the admission of four documents challenged by Borg-Warner was not prejudicial error.

4. *Existence of the York-Republic agreement.*

■ Borg-Warner contends that the contract between York and Republic had ceased to exist before any dealing with Borg-Warner in 1959 which could be deemed an inducement to breach it. Borg-Warner contended, and the district court agreed, though Republic did not, that questions concerning the continuing existence of the contract must be determined by application of Brazilian law. There was a separate court trial concerning the content of Brazilian law, and

---

2. Restatement, Torts, sec. 766, Comment *m*.

3. Restatement, Torts, sec. 766, Comment *d*.

4. Doremus v. Hennessy (1898), 176 Ill. 608, 52 N.E. 924, 43 L.R.A. 797; London Guarantee & Acc. Co. v. Horn (1903), 206 Ill. 493, 69 N.E. 526; Milliken v. Hildebrand (1924), 234 Ill.App. 276; Pilurs v. Elco Construction Co. (1958), 16 Ill.App.2d 543, 149 N.E.2d 104.

5. Northern Insurance Co. of New York v. Doctor (1st Dist. 1959), 23 Ill.App.2d 225, 228, 161 N.E.2d 867, 869, quoted in National Gas Appliance Corp. v. Manitowoc Company (7th Cir. 1963), 311 F.2d 896, 899, fn. 5. See also: Meadowmoor Dairies v. Milk Wagon Drivers' Union, etc. (1939), 371 Ill. 377, 21 N.W.2d 308, 314; W. P. Iverson & Co. v. Dunham Manufacturing Co. (1st Dist. 1958), 18 Ill.App.2d 404, 152 N.E.2d 615, 621.

Borg-Warner produced an expert. On appeal, it contends that (1) the contract was rescinded, as a matter of law, March 17, 1958 and (2) if any question of fact remained, the court did not instruct the jury properly.

On March 17, 1958, Republic wrote to York that it would not consider York's request for additional blueprints until York brought its royalty payments up to a current basis. Republic supplied no blueprints after that date. York continued to sell gears under the Republic name. It made a payment on past royalties in June, 1958, but made no payments for royalties occurring after March 17, although it appears to have recognized, at times, that they did accrue. The parties later discussed modification of the contract.

The expert testified in part that under Brazilian law "If both of the contracting parties do not fulfill their obligations, it is understood that the continuation of the contract does not interest the parties. And their silence as to rescission may be accepted as an expression of their will, in view of their reluctance to fulfill their obligations." He expressed his own opinion that this type of rescission occurred as of March 17, 1958. We are not convinced, however, from reading his entire testimony, that the Brazilian principle of rescission by non-fulfillment compelled the conclusion, under the facts of this case, that the contract was rescinded.

We find no error in the pertinent instruction. The instruction stating the principles of law governing breach and termination was requested by Borg-Warner. The court omitted the concluding paragraph of the request, but its content was sufficiently implied or expressed elsewhere. The court refused an instruction in which an attempt was made to list the obligations which the contract imposed on the respective parties and to state the effect of the breach of any. Even if the requested instruction was correct, the failure to give it was not reversible error.

5. *The damage award.*

Borg-Warner contends that the evidence does not support the award of $400,000 damages and that errors occurred in the submission of this issue.

The jury's task was to award a number of dollars which would, as of June 16, 1967, the date of its verdict, compensate for an injury which had occurred in the fall of 1959. Borg-Warner's tort, in 1959, deprived Republic of the performance by York from month to month of a contract which would run until 1970. The cost of performance by Republic from 1959 to 1970 would have been minimal and can be disregarded. The fundamental problem was to determine the reasonably probable amounts of royalties which York would have paid from time to time from 1959 to 1970, but for the wrongful inducement, and determine the present value, as of June, 1967, in dollars, of those periodic payments.

The jury knew the approximate level of sales and resulting royalties achieved up to late 1959. There was evidence that the number of vehicles in Brazil increased very substantially after 1959. Since the gears involved were sold for replacement purposes, the market increased, and it is reasonable to suppose that York would have sold an increasing number of gears.

Under the terms of the contract, the royalty was payable in Brazil, in cruzeiros. The value of cruzeiros in terms of dollars has fallen catastrophically. In late 1959, the exchange rate of cruzeiros for dollars was about 200 to one. At the time of trial the rate was 2,680 to one. Although Republic failed to produce statistics as to changes in the prices of commodities generally, or of gears in particular, in Brazil, it is probable that prices of gears in cruzeiros tended to increase as the dollar value of cruzeiros went down. Since the royalty was fixed in terms of percentage, the amount of royalty per unit in cruzeiros would increase with the price per unit.

It quite clearly appears that the jury award of $400,000 was based upon the

proposition that if York had not been induced to repudiate, the dollar value of royalties would have averaged $3,000 per month from December 1, 1959 to June 30, 1970. Borg-Warner does not dispute the computation of Republic's counsel that $3,000 per month from December 1, 1959 to time of trial, increased by appropriate interest, plus $3,000 per month from time of trial to June 30, 1970, reduced by appropriate discount, would total $400,-000. The $3,000 per month figure was probably selected because of an offer made to York by Republic in October, 1959, to modify the contract to provide a fixed royalty of $4,000 per month, subject to a 25% discount if paid within 30 days from the due date.

It can not be determined with certainty, of course, that York would have accepted this modification but for the inducement by Borg-Warner. There is evidence, however, that the dollar value of royalties accrued before December 1, 1959 averaged about $2,000 per month. Sales by York appeared to be expanding. The potential market increased substantially as time went on. The fact that the royalty obligation was measured in percentage of sales would tend to compensate for the inflation of Brazilian currency. In the light of all these factors, we conclude that fixing a dollar value of $3,000 per month on the anticipated royalties was a reasonable method of estimation whether one assumes that the offer of modification would have been accepted or not.

At one point before trial, the district court decided that the law of Brazil governed damages as well as questions of the interpretation and rescission of the contract. It is implicit, however, in the court's later actions that this point of view was abandoned. The parties appear to agree that the allegedly tortious conduct of Borg-Warner was sufficiently carried out in Illinois so that Illinois law governs in determining whether Borg-Warner's conduct subjected it to liability to Republic. We think it follows that the Illinois law governing damages also applies. Borg-Warner, contending that we must look to the law of Brazil on this subject, has not shown that the Brazilian law is different, but relies on a failure of proof by plaintiff, since Republic did not prove that Brazilian law would permit an award of damages.

Borg-Warner also appears to argue that the jury must determine the total amount of cruzeiros which would have become due to Republic under the contract and convert that amount into dollars at the exchange rate existing at the date of the verdict. Die Deutsche Bank Filiale Nurnberg v. Humphrey (1926), 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383, would appear to require that formula if this were an action by Republic against York for damages under the contract, an obligation payable in cruzeiros. This action, however, is against Borg-Warner for damage done by a tort committed in 1959 and subject to the law of Illinois. But for the tort, Republic would presumably have had the benefit of its contract as royalties became due from time to time, and it would presumably have converted the royalties received at any time in cruzeiros into dollars at the then current rate of exchange. The fact that the damages for the tort are measured by the value of the contract, and its value in turn by its probable proceeds, does not convert this action into an action to recover an obligation payable in cruzeiros.

Borg-Warner makes a number of claims of error at trial in addition to those we have specifically dealt with in this opinion. We do not find reversible error in any of them.

The judgment is affirmed.