The WALDINGER CORPORATION, Plaintiff,

v.

ASHBROOK–SIMON–HARTLEY, INC., and CRS Group Engineers, Inc., Clark Dietz Division, Defendants.

ASHBROOK–SIMON–HARTLEY, INC., Third-Party Plaintiff,

v.

CRS GROUP ENGINEERS, INC., CLARK DIETZ DIVISION, Third-Party Defendant.

No. 80–2008.

United States District Court, C.D. Illinois, Danville Division.

Feb. 9, 1983.

William King, Davis, Hockenberg, Wine, Brown & Koehn, Des Moines, Iowa, Janet A. Flaccus, Phebus, Tummelson, Bryan & Know, Urbana, Ill., for plaintiff.

Charles Palmer, Franklin, Flynn & Palmer, Champaign, Ill., Larry L. Shepler and Craig A. Levien Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, Iowa, for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND FINAL ORDER

BAKER, District Judge.

The plaintiff, The Waldinger Corporation (Waldinger), a citizen of Iowa, complains that the defendant, Ashbrook-Simon-Hartley, Inc. (Ashbrook), a citizen of Texas, breached its contract to supply Waldinger with sludge dewatering machinery for use in the waste water treatment facilities being constructed by the Urbana and Champaign Sanitary District (Sanitary District), an Illinois municipal corporation, in Urbana and Champaign, Illinois. Waldinger also complains that the defendant, CRS Group Engineers, Inc., Clark Dietz Division (Dietz), sued originally as Clark Dietz & Associates, Inc., a citizen of Illinois, was negligent in failing to draft proper specifications for sludge dewatering equipment to be incorporated in the Sanitary District's treatment plants. Alternatively, Waldinger claims that Dietz intentionally interfered in Waldinger's contract with Ashbrook. Ashbrook, as a defense to Waldinger's claims, pleads impracticability of performance of its contract to supply sludge dewatering equipment because of Dietz' negligent or intentional drafting of improper specifications for the sludge dewatering equipment. In the alternative, Ashbrook claims that if it is liable to Waldinger then Dietz must indemnify Ashbrook for that liability. More than $10,000.00 exclusive of interest and costs is at issue. Jurisdiction is vested in the court under 28 U.S.C. § 1332 (1976).

## FACTUAL FINDINGS

*Summary History*

In 1977 the Sanitary District was engaged in planning and designing two waste water treatment projects. The first project, identified as the Northeast Waste Water Treatment Facility, was located on East University Avenue in Urbana, Illinois. The second project entailed modifications and additions to the Southwest Waste Water Treatment Facility, which was located at Windsor and Rising Roads near Champaign, Illinois.

In July of 1977 both the United States and the Illinois Environmental Protection Agencies granted approval of the final construction drawings and specifications for the projects and approved the issuance of construction permits. Dietz, as engineer for the Sanitary District, was responsible for the preparation of the specifications for the waste water treatment facilities. The specifications prepared by Dietz are contained in Exhibits W–1 and W–2.

Among the equipment required for the waste water treatment projects were belt filter presses. Those presses are described in § 11140 *et seq.* of the specifications. The specifications detail two kinds of requirements for the belt presses—performance capabilities and mechanical components. The performance specifications describe the abilities a press must have in terms of production. The mechanical specifications define physical dimensions, construction materials, and details of the subsystems of the machine.

Waldinger, a mechanical contractor, in preparing to bid on the mechanical portions of the Sanitary District's projects, solicited prices on sludge dewatering machinery from belt press manufacturers. Waldinger received quotations for sludge dewatering equipment from Ashbrook, E.D.C. Corporation, The Ralph B. Carter Company (Carter) and Komline-Sanderson Company (Komline).

Bids for the projects were opened by the Sanitary District on March 30, 1978, and G.L. Tarlton Contracting Company (Tarl-

ton) was the successful bidder as general contractor. Waldinger was the successful mechanical subcontractor, and Ashbrook was the successful supplier of sludge dewatering equipment.

On May 22, 1978, pursuant to quotes made to Waldinger in February, 1978, Ashbrook executed purchase orders prepared by Waldinger and agreed to furnish the sludge dewatering machinery for the Sanitary District Projects "in complete accordance with plans and specifications § 11141-sludge dewatering system including all applicable specification sections made reference to in that section." Ashbrook also agreed in its contract with Waldinger to furnish all required submittal data for approval by the owner's engineer in such a manner as to meet the requirements of the plans and specifications.

On April 5, 1978, after the bids had been opened and Tarlton, Waldinger, and Ashbrook were the apparent successful bidders on the aspects of the projects which are the subject of this case, Dietz held a meeting with representatives of the successful bidders to discuss equipment for the project. At the meeting Dietz' representatives stated that the Ashbrook 1–V Winklepress, which had been bid to Waldinger, had been previously evaluated by Dietz and was regarded as not having adequate capacity to comply with the contract documents. Dietz further said it would not approve the size 1–V machine upon the information available to Dietz at that time. Ashbrook stated that it would provide actual operation data to confirm the capacity of the 1–V machine and would supply equipment that would comply with the specifications.

Between June 1978 and July of 1979 Ashbrook submitted operating data on its 1–V Winklepress from various sites to Dietz and prepared a number of shop drawing submittals involving the size 1–V machine. The data and the shop drawings submittals were rejected by Dietz which insisted on strict adherence to the specifications.

On October 5, 1979, Ashbrook submitted a proposed change order to Dietz requesting a modification of the contract price for the filter press equipment. Dietz refused to recommend the proposed change order to the Sanitary District and told Ashbrook that the proposed change order would not be approved.

On October 23, 1979, Ashbrook notified Waldinger that Ashbrook would not fulfill its contract with Waldinger until there was a modification of the contract price. A similar demand was made by Ashbrook on November 6, 1979. Finally, on December 3, 1979, Ashbrook notified Waldinger that Ashbrook was unable to supply the equipment described in the specifications set forth in the contract.

On January 2, 1980, Waldiner terminated the purchase orders to Ashbrook and obtained the sludge dewatering equipment for the Sanitary District projects from The Ralph B. Carter Company of Hackensack, New Jersey.

*Belt Filter Presses*

The function of a belt filter press in a waste water treatment plant is to remove waste solids from the waste water. Sewage enters the belt filter press as a slurry of solids and water. The slurry is mixed with polymers, organic compounds which cause the solids in the slurry to floculate. The floculated sludge is deposited in a section of the machine where gravity dewatering takes place and excess water drains off from the floculated sludge. The floculated sludge is then fed into a shear press section of the machine where more water is extracted by shear pressure and the sludge emerges from the filter press as a friable, cake solid.

Different belt filter presses have different mechanical features. The Ashbrook Winklepress was a flat belt press and its gravity dewatering section was a flat belt upon which the polymer treated sludge was spread to allow the separated water to run off. The polymer mixing section was a static vortex shaped device with adjustable feed controls for injecting polymer and sludge. The Carter machine, which is the other belt press featuring in the contentions in this litigation, had a revolving drum in

which the polymer and sludge were mixed and had a second revolving section called a "reactor conditioner" in which the gravity dewatering took place. From the "reactor conditioner", the sludge in the Carter machine was fed into a shear belt pressure dewatering section not unlike that found in the Ashbrook machine.

*Did Dietz prepare exclusionary specifications?*

The initial question in this litigation is whether the engineering specifications for the sludge dewatering system were worded in such a way that only the equipment of a particular manufacturer would conform to the specifications. It is manifest that Dietz patterned the sludge dewatering equipment specifications on equipment produced by the Carter Manufacturing Company.

Robert Hurdle, the engineer called by Dietz as an expert, said his examination of the Dietz files showed that Carter had supplied the data and performance descriptions for the sludge dewatering equipment which Dietz adopted and incorporated in the specifications.

John Sakolowsky, the Dietz project manager for the Sanitary District, admitted that the specifications were drafted around systems provided by Carter and subsystems that were available from the Carter Manufacturing Company. Sakolowsky said the Carter 15–31 machine was the machine whose subsystems were described in the specifications and that it was in the late summer of 1977 that Dietz decided to use Carter as a model.

Edward Nevers, a member of the Dietz design team and the Dietz engineer to whom the task of gathering information on belt filter presses was assigned, said that the specifications were closely patterned on Carter machine specifications and that none of the components were different from Carter's. The "reactor conditioner" gravity dewatering section described in the specifica-

tions was clearly a Carter design. Nevers said that if the flat belt gravity dewatering provision in the specifications had been omitted then the specifications would have described a Carter machine and nothing else.

Harold W. Johnson, an expert in chemistry and environmental science presented by Ashbrook who at one time in his career had worked for the Carter Company, said he was familiar with the specifications for the Sanitary District project and those specifications described the Carter machine. No manufacturer but Carter, Johnson said, could have met the specifications for the sludge dewatering equipment.

Some of the witnesses testified that the specifications were not discriminatory or exclusionary because manufacturers other than Carter were "able" to produce the machine described. I find that testimony totally unpersuasive because if the specifications were literally enforced, which they were, other manufacturers would have been required to redesign their equipment and to retool in order to comply with the specifications. That would not be economically competitive by any stretch of the imagination.

*Was Dietz' conduct intentional?*

I find that it is more probably true than not true that Dietz intended to use the Carter equipment in the Sanitary District project to the exclusion of the equipment of other manufacturers. I find the Dietz decision to use Carter equipment was made consciously and deliberately.[1]

Clearly, Dietz understood the Environmental Protection Agency's requirements concerning competition among bidders and the need to draft specifications to achieve those requirements. 40 C.F.R. §§ 35.936–3, 35.936–13 (1976). There is also no question that Dietz was staffed by competent and experienced engineers. Notwithstanding that, Dietz insisted almost blindly on the literal requirements of the specifications it

---

1. It is also true that some of Dietz' decisions with regard to the drafting and enforcing of the specifications did not conform to standards which reasonably well qualified engineers would have applied under like or similar cir-

cumstances. Consequently Dietz' conduct in preparing and enforcing the specifications viewed according to that standard was also negligent.

had drafted when there was no scientific foundation or empirical basis for that insistence.

Sakolowsky said that Dietz relied on Carter and believed Carter to be a leader in its field. Although he had never seen a Carter 15–31 machine perform, he decided to use it as a model. He did so without investigating whether certain aspects of the Carter machine were covered by patents and, in fact, as it developed, the "rotator conditioner" described in the specifications was patented.[2] He knew that no manufacturer other than Carter recycled the belt wash water used in the machine, but nonetheless, specified that subsystem when he knew of nothing that would prove that belt wash recycle would increase solid removal or reduce polymer consumption in the sludge dewatering process.

The building that Dietz had designed to house the sludge dewatering equipment was sized to fit the Carter 15–31 machine. On January 31, 1978, when Dietz wrote to Ashbrook (Exhibit A–19), Dietz took the position that an Ashbrook machine larger than its 1–V press would not fit into the building as designed.

In August of 1978, Dietz, on the basis of field tests, had reached the conclusion that the Ashbrook 1–V machine met the performance requirements of the specifications, but Dietz subsequently rejected the 1–V machine because it did not have proven dewatering capacity with alum sludge, which was the sludge present in the Sanitary District's treatment facilities. That preference for the Carter machine over the Ashbrook machine was made even though, to the knowledge of Dietz, the Carter machine had never been tested on alum sludge. This is another indication that Dietz was determined to find any reason it could to reject the Ashbrook machine and force the installation of a Carter machine.

Sakolowsky states that in 1976 and 1977 he did nothing to determine whether the Carter claims of increased production through use of their rotating drum gravity dewatering section was factually founded. At the time of drafting the specifications Sakolowsky knew of no Carter 15–31 machine in operation. In fact, at that time, Carter only had flat belt machines in operation. Sakolowsky also knew of no manufacturer, other than Carter, who offered belt water recycling.

I found the answers Sakolowsky gave denying his intention to use Carter to the exclusion of other manufacturers dissembling, and I form the conclusion that it was his specific intention to use a Carter machine in the project to the exclusion of the machines of other manufacturers.

Tony Cantello, the third member of the Dietz design team, confirms that as early as January 21, 1978, Dietz had reached a decision to reject Ashbrook. He testified that the building that was to house the sludge dewatering equipment was designed for future expansion, and that the inclusion of an Ashbrook Winklepress in the building would have affected that capacity. Like Sakolowsky, Cantello had no hard information concerning the performance of a Carter 15–31 machine and had never even seen one operate. While he tried to justify the specification requiring recycling belt wash water on anticipated improved solid recapture and diminution of polymer use, he admitted that there was no data to support either of those expectations. He also admitted that there was no scientific basis for saying in the specification that a flat belt press had to have a 540 square foot dewatering area.[3] Cantello also said that the stainless steel clad rollers described in the Carter specifications (Ashbrook had nylon clad rollers) were included in the Sanitary District's specifications without any scientific basis and because "we thought they

---

2. Exhibit A–56 shows that in October of 1978, Sakolowsky told the other members of his design team to verify whether any aspects of the specifications called for patented subsystems. Exhibit A–11 shows that Carter notified Dietz on September 30, 1977 that the reactor condi- tioner was patented. Dietz nonetheless includ- ed the patented item in its specifications.

3. That specification was later withdrawn by Dietz.

were better." Cantello also said the 1–V Ashbrook machine was rejected because of "tremendous clogging problems."[4] He admitted, however, that he gave no consideration whatsoever to clogging problems in the flow in the Carter machine from the polymer mixing to the gravity dewatering section.

Cantello also testified that he was one of the persons who had overruled Edward Nevers' conclusion that the Ashbrook 1–V machine had the performance capacity required by the specifications. Cantello did so because the Ashbrook machine did not recycle belt wash water.

The evidence is overwhelming that recycling belt wash water had no positive effect on a filter press' production capacities but probably had a negative effect. Dietz' expert witness, Robert Hurdle, testified that a reasonably well qualified engineer applying the standards of his profession would not have required the belt wash water to be recycled.

I find Cantello's testimony that the specifications were not tailored to fit the Carter machine incredible and his answers dissembling.

A Dietz internal memo (Exhibit A–25) shows that in March of 1978 the structural engineering division of Dietz was concerned about filter presses other than Carter's being installed in the building as designed because structural changes would be required such as reinforcing floors and moving staircases or lengthening the building by eight feet.

It is also apparent that during the period between the letting of the bids and the rejection of the Ashbrook machines, Dietz was reassuring Carter that Dietz would require rigid adherence to the specifications. Carter was obviously glad to hear that and expressed the hope that the "successful manufacturer" will be required to meet all process requirements.[5]

The specifications provided that the belt press had to fit into the designed building in space and weight. (Exhibit W–2, pages 11140–44.) This is another indication of Dietz' intention to use only the Carter equipment.[6]

Dietz' determination to have Carter equipment in the building is borne out by Edward Nevers' testimony. Nevers said that the conclusion of Exhibit A–27, an evaluation prepared by him on March 10, 1978, was that the equipment of all three manufacturers considered, Komline-Sanderson, Carter and Ashbrook, met the performance requirements of the specifications. Nevers also believed that the Ashbrook 2–V machine would fit into the building "as designed for the Carter units."

Subsequently, however, on April 5, 1978, as shown by Exhibit A–29, Nevers retreated from that conclusion. The April 5, 1978 memorandum questions the limitation on maintenance space created by use of the Ashbrook machine in a building designed for the Carter units. In addition, Dietz raised, for the first time, the special nature of the alum sludge generated at the Sanitary District plants to question the "through-put" capacity of the Ashbrook machine.[7]

While Edward Nevers came to the conclusion, as shown by Exhibit A–129, that the Ashbrook Winklepress had acceptable performance, the Dietz design team rejected that conclusion because Ashbrook did not recycle its belt wash water. When he testified, Nevers admitted there was no information on the effect of recycling belt wash water onto the flat belt gravity dewatering section of the Ashbrook press. In fact, Dietz did not consider that effect. Nevers

---

4. Ashbrook had a variable flow mixing device which it asserted eliminated any clogging. Dietz never addressed itself to that feature.

5. See Exhibit A–51 where Carter is pleased that Dietz is requiring strict conformity with the Carter specifications.

6. The Sanitary District was not pleased with the added expense for redesign of the building to support the Ashbrook equipment. See Exhibit A–99.

7. The memorandum concludes that it is impossible to predict with accuracy any unit's performance with alum sludge.

admitted on cross examination that recycling the belt wash water would have reduced the Winklepress' performance. That is clearly a contradiction of the rationale offered by Dietz for specifying the recycling of belt wash water.

Edward Nevers admitted his familiarity with the Environmental Protective Agency requirements for competition but made the startling assertion that "competition was to be taken with a grain of salt." This revealing statement reflects Dietz' attitude favoring Carter to the exclusion of others and proclaims conscious and deliberate purpose in insisting upon conformity by all bidders to the Carter specifications.[8]

When asked if Dietz had insisted upon Waldinger using Carter, Mr. Nevers said "we would have been happy to accept Carter but would have accepted others." I find that answer dissembling.

James A. Statham, who was president of Ashbrook during the bidding and testing process, testified, and I credit his testimony, that at the start of the relationship between Ashbrook and Dietz, only performance data on the 1–V Ashbrook machine was requested by Dietz. Ashbrook was confident that it would meet the performance levels. Ashbrook set about meeting the production test requirements laid down by Dietz but when those requirements were met, Ashbrook was confronted by a demand from Dietz for production data on the Winklepress' performance with alum treated sludge. Throughout the testing period Dietz kept insisting that the performance data Ashbrook submitted was insufficient although at the same time Dietz had no data at all from Carter.

Prior to November 16, 1978, Statham says, Ashbrook and Dietz never had a discussion about the mechanical aspects of the Winklepress. On that date Dietz said that Ashbrook must comply precisely with the specifications on mechanics. When Statham told Dietz that if Ashbrook built a machine according to the Dietz specifications it would be a machine designed by Dietz and would not be guaranteed by Ashbrook, Tony Cantello responded by saying that Ashbrook should not submit the 1–V Winklepress again and that the specifications were not "multiple choice."

On December 27, 1978, Ashbrook submitted its proposals for the machine demanded by Dietz (Exhibit W–17). Exhibit W–17 made no guarantee of performance because, as Statham pointed out, the submitted machine "was not a standard Winklepress," but was a machine of Dietz design.

On February 5, 1979, Dietz rejected the Ashbrook proposal (See Exhibit A–69) and directed Tarlton, the general contractor, to submit proposals from another manufacturer.

Harold W. Johnson, the chemist and environmental scientist who worked for Carter at one time and now works for Ashbrook, testified about the difference between the polymer mixing methods in the Carter equipment and in the Ashbrook equipment. Carter used a rotating drum to mix the polymer and the sludge while Ashbrook employed a static vortex mixer. The Ashbrook vortex mixer had a variable diameter orifice for mixing the sludge and the polymer to avoid clogging when an alien element, like a rag, would enter the mixing area through the sludge feed pipe. The Carter 15–31 machine, after the sludge was mixed in the rotating drum, poured the mixture into a rotating "reactor-conditioner" where the sludge lay on a rotating screen for gravity dewatering. The sludge then passed into a distribution box and from there, through two four-inch pipe openings by gravity flow, to the shear press section. In Johnson's experience at Carter,

---

**8.** As it turned out, Carter stopped manufacturing the 15–31 machine in January or February of 1978 and produced instead a 15–32 model which was what Waldinger eventually was required to install. The 15–32 model was too large and heavy for the structure designed around the 15–31 model and so additional expense was involved in redesign of the Sanitary District's buildings. The stainless steel clad, galvanized rollers specified, upon which Dietz insisted, were finally abandoned because Dietz discovered that galvanized metal cannot be coated with stainless steel.

some clogging of the pipe openings occurred which required shutting the machine down and hand clearing.

Johnson said that while recycling belt wash water worked in the Carter equipment with its rotating "reactor conditioner", in a flat belt machine, belt wash water recycling was impossible. In a flat belt gravity dewatering section, recycled belt wash water would (a) break up the floc; (b) blind the belt, *i.e.*, particles of sludge would clog the belt preventing water from draining through, and (c) destroy the solids capture performance of the machine. Johnson said that Carter was the only company in the United States that recycled belt wash water and that Carter had patents on the rotating reactor that made recycle of the belt wash water possible.[9]

Johnson also testified that he was familiar with the Sanitary District specifications for the sludge dewatering equipment and that only Carter could have met the requirements of those specifications.

Robert Hurdle, Dietz' expert witness, said that he was not persuaded that recycling the belt wash water in the sludge dewatering equipment would have increased the "through-put" performance. It was "possible," Hurdle thought, that polymer consumption would have been reduced through belt wash water recycle. However, on cross examination he pointed out that he was saying that reduced polymer consumption was only a possibility and that he could not offer an opinion of reduced polymer consumption based upon reasonable scientific certainty.

Hurdle stated that Dietz took the Carter performance claims at their face value and made no independent study of them. No tests were run by Dietz; in fact Dietz had no test results on the Carter equipment other than a bench test so that the specifications were patterned on the Carter design without a test of the 15–31 machine by anyone.

*Damages*

It is undisputed that Waldinger suffered the following damages as a result of being required to purchase Carter equipment in place of the Ashbrook equipment:

(1) Increased cost to purchase Carter equipment, $284,123.00

(2) Additional engineering fees to Dietz for consideration of the Carter equipment, $5,075.00

(3) Additional fees paid to Tarlton to construct a platform to move the Carter machine into the building, $15,008.00

(4) Waldinger's loss of use of funds through the additional expense of purchasing the Carter equipment, $64,249.00.

Total damages: $368,455.00

It is also uncontested that Waldinger has incurred attorneys' fees for services through November 1, 1982 of $40,154.00 and additional fees through January 27, 1983 of $35,138.00 and that its attorneys have made cash advances through September 1, 1982 of $9,259.79 and the additional sum of $3,301.45 in cash advances for expenses. Under its contract with Ashbrook, Waldinger was entitled to recover attorneys' fees and expenses for Ashbrook's breach.

*Did Ashbrook bid knowing it could not perform?*

A factual contention is made by Waldinger, and to some extent by Dietz, that Ashbrook undertook the job of supplying the sludge dewatering equipment with full realization that Ashbrook could not meet the requirements of the Sanitary District specifications. I reject that factual contention. I credit the testimony of the witnesses for Ashbrook, Statham and Hartley, who testified that Ashbrook bid to supply the sludge dewatering equipment relying upon the requirement that specifications foster competition and that specifications not be exclusionary or discriminatory. Ashbrook had the right to rely upon its experience that specific mechanical subsystems were ordinarily waived by the owner's engineer if a

---

**9.** It is interesting to note, and Johnson reports, that Carter has returned to a flat belt press design on its series 34 machines and does not recycle belt wash water on those machines. Prior to 1975 Carter had a flat belt in its gravity dewatering section.

supplier could show that the supplier's equipment met performance specifications. Moreover, as Statham testified, the specifications that Dietz had prepared made it impossible for anyone but the Carter company to meet the literal specifications of the mechanical subsystems.

Statham's claim that waiver of mechanical subsystem requirements was a practice in the industry is supported by the bid of Komline-Sanderson Engineering Corporation, a competitor in the field of sludge dewatering equipment. That bid read, "generally in accordance with and to meet the intent of the plans and specifications." (Exhibit A–26). The fact that three companies in addition to Carter bid on supplying the sludge dewatering equipment, even though the plans and specifications obviously were drawn around Carter equipment, supports the contention of Ashbrook that the bidding was made with the intent to conform to the performance requirements but not the literal requirements of the mechanical subsystems.

## CONCLUSIONS OF LAW

This suit began with Waldinger seeking recovery from Ashbrook on the theory of breach of contract. Ashbrook admitted that it breached its contract with Waldinger but claimed that Ashbrook should be excused from liability because of impracticability of performance occasioned by the intervention of Dietz. Ashbrook sought damages from Dietz and brought it into the case as a party and Waldinger amended its pleadings to seek recovery against Dietz as well as against Ashbrook. Counterclaims by Dietz were withdrawn by it in the course of the trial.

Waldinger and Ashbrook seek to recover damages from Dietz on two tort theories. First, Waldinger and Ashbrook claim that Dietz intentionally interfered in the contractual relationship between Waldinger and Ashbrook, causing them damage. Second, Waldinger and Ashbrook claim that Dietz, as engineer in the Sanitary District project, had a duty to perform its contrac-

tual obligations to the Sanitary District with ordinary care so as to avoid injury to Waldinger and Ashbrook.[10]

*The Theory of Intentional Interference*

██ Illinois recognizes the tort of intentional interference with contractual relationships. *O'Brien v. State Street Bank and Trust Co.,* 82 Ill.App.3d 83, 85, 37 Ill. Dec. 263, 401 N.E.2d 1356 (1980); *Northern Insurance Co. of New York v. Doctor,* 23 Ill.App.2d 225, 228, 161 N.E.2d 867 (1959); *Republic Gear Company v. Borg-Warner Corporation,* 406 F.2d 57, 61 (7th Cir.1969).

> The elements which establish a prima facie tortious interference are the existence of a valid business relationship ... or expectancy; knowledge of the relationship or expectancy on· the part of the interferer; an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. The interest protected is the reasonable expectation of economic advantage.

*O'Brien,* 82 Ill.App.3d at 85, 37 Ill.Dec. 263, 401 N.E.2d 1356 (quoting *City of Rock Falls v. Chicago Title & Trust Co.,* 13 Ill.App.3d 359, 363, 300 N.E.2d 331 (1973)). *See also Doctor,* 23 Ill.App.2d at 228, 161 N.E.2d 867 and *Republic Gear Co.,* 406 F.2d at 61.

██ Malice in the sense of ill will is not a requisite to recovery. Intentional conduct which brings about the breach with knowledge of the relationship is all that is required. *W.P. Iverson & Co. v. Dunham Manufacturing Co.,* 18 Ill.App.2d 404, 152 N.E.2d 615 (1958); *Republic Gear Company v. Borg-Warner Corporation,* 406 F.2d 57 (7th Cir.1969).

> It is not necessary, however, that the purpose to cause the breach of contract or failure to deal be the actor's sole or paramount purpose. It is sufficient that he designs this result whether because he desires it as an end in itself or because he regards it as a necessary, even if regrettable, means to some other end. . . . 'Ill will' toward the person harmed is not an

**10.** Ashbrook's claim of indemnity from Dietz is

an aspect of a claim sounding in negligence.

essential condition of liability; the actor 'may be liable even when he acts with no desire to harm the other.' And as to the often cited requirement of malice, it is said: 'But the context and course of decision makes it clear that what is meant is not malice in the sense of ill will but merely purposeful interference without justification.'

*W.P. Iverson & Co. Inc.,* 18 Ill.App.2d at 418, 152 N.E.2d 615 (quoting *Republic of Italy v. DeAngelis,* 206 F.2d 121, 130 (2nd Cir.1953) (Clark, J., concurring) (citing 4 Restatement of Torts § 766 *et seq.* (1939)).[11]

It is uncontested that a contractual relationship existed between Waldinger and Ashbrook and that Dietz had full knowledge of that relationship. It is the third element, an intentional interference inducing or causing a breach or termination of the relationship or expectancy, that was contested by the parties.

As set out in the finding of facts, *supra* p. 974, it is manifest that Dietz patterned the sludge dewatering equipment specifications on equipment produced by the Carter Manufacturing Company. It is also clear that Dietz insisted on the use of Carter equipment and conformity to Carter design purposefully and in deliberate disregard of 40 C.F.R. § 35.936–13 (1976) which required open and free competition.

There was no rational basis for Dietz' insistence on the Carter mechanical subsystems. There was no showing that the Carter mechanical subsystems were reasonable and necessary for the purpose intended for the sludge dewatering equipment. There was no scientific foundation for requiring recycle of the belt wash water. There was no data available from tests on alum treated sludge.

Dietz took Carter's performance claims at face value and made no independent study of them. In fact, the specifications were patterned on the Carter design without a test of that company's 15–31 machine by anyone. There was nothing to substantiate that recycling belt wash water would have increased the "through-put" performance of the belt press and it was only a possibility without reasonable scientific certainty that polymer consumption might have been reduced. In sum, Dietz arbitrarily insisted on literal conformity to the Carter mechanical subsystems and did so without any rational or scientific engineering basis.

That Dietz' conduct was deliberate and intentional is borne out by the testimony of Sakolosky, Cantello and Nevers. What those three individuals or Dietz or the Sanitary District stood to gain from insistence on use of the Carter equipment is not at all clear from the evidence. The most that can be said is that early in its design work, the Dietz team formed the opinion that the Carter equipment was superior, although the team provided no basis for that conclusion. It is also apparent that Dietz designed the structure housing the sludge dewatering equipment on the basis of the Carter specifications and, when a competitor of Carter became the successful bidder, structural difficulties arose in trying to fit an alien machine into the space designed and the team may have been trying to avoid those difficulties.

The fourth element, the amount of damages, like the first and second elements, is virtually uncontested. No disagreement is raised over the amount of damages suffered by Waldinger although Dietz argues strenuously that the plaintiffs may not recover economic losses.[12] It is Dietz' position that it cannot be liable for economic losses experienced by Waldinger because the claim

---

11. Dietz argues that *Millsaps v. Bankers Life Co.,* 35 Ill.App.3d 735, 342 N.E.2d 329 (1976) and *Bates & Rogers Construction Co. v. Northshore Sanitary District,* 92 Ill.App.3d 90, 47 Ill.Dec. 158, 414 N.E.2d 1274 (1980) require malice as an element of the course of action. A reading of those cases shows that *Bates* relies upon *Millsaps* and *Millsaps* relies upon *Iverson* which is quoted above. *See also Republic Gear*

*Co. v. Borg-Warner Corporation,* 406 F.2d 57 at 61.

12. Ashbrook proved no damages beyond asserting that it was entitled to reimbursement from Dietz for any sums Ashbrook was required to pay Waldinger.

against Dietz sounds in tort and under the holding of *Moorman Manufacturing Company v. National Tank Company,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), economic losses are not recoverable. Dietz' reliance upon *Moorman* is misplaced. In *Moorman* the plaintiff sought to recover for economic losses experienced as a result of defective conditions in a grain bin. The plaintiff proceeded on theories of strict liability in tort and of warranty. *Moorman* does not bar a suit for direct losses based on negligence although, under the language of the case, apparently solely economic loss cannot be recovered in a negligence action. *Id.* at 88, 61 Ill.Dec. 746, 435 N.E.2d 443. However, *Moorman* makes it quite clear that economic loss is recoverable when it is attributable to intentional conduct on the part of the defendant. *Id.* at 88–89, 61 Ill.Dec. 746, 435 N.E.2d 443. (Plaintiff could recover economic loss attributable to intentional misrepresentation.)

The case of *Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982), follows *Moorman* but, contrary to Dietz' contention, does not stand for the proposition that economic losses may not be recovered in tort. *Redarowicz* holds, "the complained of economic losses are not recoverable *under a negligence theory.*" *Id.* at 178, 65 Ill.Dec. 411, 441 N.E.2d 324 (emphasis added). *See also Pittway v. Lockheed,* 641 F.2d 524 (7th Cir.1981) (Illinois will not permit recovery of economic losses on a negligence theory).

The court concludes, therefore, that Waldinger may recover its damages, including strictly economic loss, because the theory of recovery is for intentional conduct, not merely negligent conduct. That strictly economic losses should be recoverable in the tort of intentional interference with a contractual relationship is borne out by the rationale underlying the right to recover. "The interest protected is the reasonable expectation of economic advantage." *O'Brien,* 82 Ill.App.3d at 85, 37 Ill. Dec. 263, 401 N.E.2d 1356.

*Attorneys' Fees as an Element of Damages*

In this action the court concludes that the attorneys' fees incurred by Waldinger in prosecuting its claims against Ashbrook and Dietz are recoverable as damages and should be assessed against Dietz.

Generally, attorneys' fees may not be recovered except when their recovery is provided for by statute or by contract. *See Ritter v. Ritter,* 381 Ill. 549, 46 N.E.2d 41 (1943). That general rule, however, is not without exception. *See Omni Overseas Freighting Company v. Cardell Insurance,* 78 Ill.App.3d 639, 33 Ill.Dec. 779, 397 N.E.2d 112 (1st Dist.1979). There are two independent grounds upon which the award of attorneys' fees is warranted in this case.

First, this case involves a contract which specifically provides for the recovery of attorneys' fees. Waldinger and Ashbrook agreed that, in the event of a breach by Ashbrook, Waldinger could recover its attorneys' fees. Here, however, Ashbrook's breach was caused by Dietz' intentional conduct and was excusable because of commercial impracticability of performance. Waldinger's reasonable expectations regarding the payment of its attorneys' fees should not be defeated by Dietz' deliberate acts, but the party responsible for Ashbrook's breach, Dietz, should be held liable for Waldinger's attorneys' fees.

Second, courts have determined that assessing attorneys' fees against a third party as an element of damages is warranted when a lawsuit has been occasioned by the misconduct of the third party. *See Sorenson v. Fio Rito,* 90 Ill.App.3d 368, 45 Ill.Dec. 714, 413 N.E.2d 47 (1st Dist.1980); *M.F. Roach Company v. Town of Provincetown,* 355 Mass. 731, 247 N.E.2d 377 (1969). Waldinger's suit against Ashbrook arose from Dietz' intentional interference with the contractual relationship of Waldinger and Ashbrook, and Dietz is liable for the reasonable fees incurred by Waldinger. As stated in *Sorenson v. Fio Rito, supra,* "Illinois law does not preclude ... awarding attorneys' fees when those fees constitute nothing more than ordinary losses resulting from the defendant's conduct." *Id.* at 374, 45

Ill.Dec. 714, 413 N.E.2d 47. *See also Garris v. Schwartz,* 551 F.2d 156, 159–161 (7th Cir.1977) (Pell, J., dissenting); *Evra Corporation v. Swiss Bank Corporation,* 522 F.Supp. 820, 834–35 (N.D.Ill.1981).

*Negligence by Dietz*

■ In light of the findings and conclusions relating to the plaintiffs' theory of intentional conduct, it is not necessary to dwell upon the question of Dietz' negligence. Suffice it to say that the record also supports the conclusion that Dietz failed to exercise ordinary care in its preparation of the specifications and its insistence on the use of the Carter mechanical subsystems. That conclusion is supported by the testimony of Dietz' expert Hurdle.

■ ▪ Under Illinois law, Dietz, as the engineer for the Sanitary District, owed Waldinger and Ashbrook a duty to use ordinary care not to cause them loss or damage where it was foreseeable that Waldinger and Ashbrook would rely upon the skill of Dietz. *Miller v. Dewitt,* 59 Ill.App.2d 38, 208 N.E.2d 249 (4th Dist.1965), *aff'd in part and rev'd in part on other grounds,* 37 Ill.2d 273, 226 N.E.2d 630 (1967). The difference between a negligence theory of recovery and an intentional conduct theory of recovery would be that Ashbrook and Waldinger could collect only direct damages and not their economic losses as well. *Moorman Manufacturing Company v. National Tank Company, supra* and *Redarowicz v. Ohlendorf, supra.*

*Prejudice to Dietz?*

Dietz argues at page 8 of its brief that the court's ruling, *in limine,* that Waldinger could not recover "loss of use of money" and "attorneys' fees" from Dietz under its negligence theory but could recover those items from Ashbrook under its contract theory was prejudicial to Dietz. The prejudice claimed is that Dietz was thereby not afforded an opportunity either to question Waldinger's damages or to submit any evidence in opposition thereto. I find this

argument incomprehensible because Dietz must have known that Waldinger and Ashbrook were proceeding on the alternative theory of intentional conduct. See Document No. 53, filed April 28, 1982 in which Waldinger claims intentional conduct on the part of Dietz. See also Document No. 52, item no. 8, where Dietz states that a contested issue of fact is whether Dietz intentionally interfered with the contractual relationship between Waldinger and Ashbrook. Moreover, at no time did Dietz seek a continuance or ask for an opportunity to marshal and present evidence on the points about which it now claims prejudice.

*Ashbrook's Administrative Remedies*

Dietz argues that Ashbrook waived its statutory administrative remedy of protest and is thereby estopped to recover from Dietz. Because of the disposition of the case on Waldinger's claim for intentional interference with its contractual expectancies, discussion of this point is not necessary to the disposition of the case. In passing, however, the court notes that the cases cited by Dietz[13] dealing with lack of standing to sue by an unsuccessful bidder on a federal agency project have no bearing on the questions in this case. Ashbrook is not seeking to recover from the Sanitary District but seeks damages from a third party for its intentional conduct which made the specifications discriminatory and noncompetitive. Ashbrook relied upon Dietz to draw competitive nondiscriminatory specifications in compliance with the Code of Federal Regulations. Ashbrook is not here claiming that it was excluded from competition in the bidding process but for the loss of the reasonable expectation of economic advantage from Ashbrook's contract with Waldinger and to recover also the economic losses flowing from the breach of that relationship.

It is noteworthy that the administrative opportunity for review of the specifications by the Environmental Protective Agency

---

**13.** *Perkins v. Lukens Steel Co.,* 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); *Standard Engi-* *neers v. U.S.E.P.A.,* 483 F.Supp. 1163 (1980).

had expired by the time it became apparent that Dietz was insisting upon use of the Carter mechanical subsystems.[14]

When Ashbrook did file a protest, Dietz moved to dismiss it because it was not timely. Ashbrook could not have gone to the Environmental Protective Agency when on the face of the protest, it showed that it was untimely. In short, there was no administrative remedy available to Ashbrook at the time that the discrimination became manifest.

If Dietz had made it perfectly clear in the spring of 1978 that it intended to insist on literal compliance with the mechanical aspects of the belt filter press specifications, there might have been an opportunity to seek administrative review of that decision through the Environmental Protection Agency. Dietz, however, waited until November of 1978 before informing Ashbrook that it must comply literally with the specifications on mechanics. *See* pp. 4 and 18 of the findings of fact.

*Ashbrook's Impracticability of Performance*

 Ashbrook contends that it is excused from performing its contract with Waldinger. Under the facts of the case, the court concludes that contention is meritorious.

The Uniform Commercial Code, § 2–615, Excuse By Failure of Presupposed Conditions, provides in pertinent part:

(a) [N]on-delivery in whole ... by a seller ... is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made ....

Ill.Rev.Stat. ch. 26, § 2–615(a) (1961).

 Three conditions must be met before a seller is excused from performance under the Uniform Commercial Code:

(1) a contingency must occur, (2) performance must thereby be made "impracticable" and (3) the nonoccurrence of the contingency must have been a basic as-

sumption on which the contract was made.

*Luria Bros. & Co. v. Pielet Bros. Scrap Iron,* 600 F.2d 103, 111 (7th Cir.1979), citing *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283, 293 (7th Cir.1974).

A basic assumption under the contract between Ashbrook and Waldinger in this case was that the Ashbrook machinery was competitive and would comply with the specifications drafted by Dietz. That assumption was based on the belief that the Dietz specifications would be interpreted by Dietz in a competitive and nonrestrictive way. However, the specifications were interpreted by Dietz in a restrictive and noncompetitive way, thereby rendering performance by Ashbrook impracticable.

Restatement (Second) of Contracts § 266, on Existing Impracticability or Frustration, provides a parallel authority for excusing Ashbrook's performance. Section 266 says:

(1) [w]here, at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary.

Illustration 10 to this section describes an analogous situation:

10. A contracts with B to manufacture and deliver a light weight electronic device according to specifications furnished by B's engineers. It is not possible for any manufacturer to keep the weight within the contract specifications, but A has no reason to know this. A does not deliver the device. The court may determine from all the circumstances, including the fact that B furnished the specifications, that A is under no duty to deliver the device because of the impracticability of doing so and that A is not liable to B for breach of contract.

14. *See* 40 C.F.R. § 35.939(b)(2) (1976).

The illustration is analogous to this case because Ashbrook could not have known that Dietz' specifications would have been interpreted in such a way as to require Ashbrook to manufacture a Carter machine.

The court concludes that Ashbrook has satisfactorily established the defense of impracticability of performance and is not liable to Waldinger for breach of contract.

## FINAL ORDER

Pursuant to the foregoing findings and conclusions, the Clerk is directed to enter judgment in favor of the plaintiff, The Waldinger Corporation, and against the defendant, CRS Group Engineers, Inc., Clark Dietz Division, in the sum of $366,455.00 as damages and for the further additional sum of $75,292.00 in attorneys' fees and for $12,561.24 in cash advances for expenses.

The Clerk is further directed to enter judgment in favor of the defendant, Ashbrook-Simon-Hartley, and against the plaintiff, The Waldinger Corporation; the plaintiff to take nothing and the defendant to go hence without pay.

Costs of suit assessed against the defendant, CRS Group Engineers, Inc., Clark Dietz Division.