# ST. PAUL DREDGING COMPANY v. STATE.

107 N. W. (2d) 717.

February 10, 1961—No. 38,011.

*Walter F. Mondale,* Attorney General, *Paul L. Skjervold,* Deputy Attorney General, and *D. P. Kane,* Special Assistant Attorney General, for appellant.

*William C. Blethen, Kelton Gage,* and *Blethen, Ogle & Gage,* for respondent.

THOMAS GALLAGHER, JUSTICE.

St. Paul Dredging Company, plaintiff, seeks damages against the State of Minnesota for breach of a contract, S. P. 6947-06, for widening and grading shoulder of state Highway No. 216 for a distance of 17 miles beginning east of Hibbing. Plaintiff's action is based upon its contention that contract specifications called for the defendant to furnish a highway worksite free from utility poles, that it failed to do so, and that in consequence plaintiff sustained damages.

The trial court construed the contract in accordance with plaintiff's contentions and charged the jury as a matter of law that defendant had failed in its obligation to plaintiff, submitting for determination only the issue of damages. The jury returned a verdict for plaintiff in the sum of $40,438.08. This is an appeal from an order denying defendant's subsequent alternative motion for judgment notwithstanding the verdict or for a new trial.

Defendant does not challenge the amount of the verdict as a measure of damages but contends that (1) the court erred in instructing

the jury that a contractual duty rested upon it to provide plaintiff with a highway worksite free of utility poles; (2) if the language of the contract and specifications be regarded as ambiguous, the issue of what the parties intended should have been submitted to the jury; and (3) if the contract did not impose an absolute duty upon defendant to provide a construction site free of utility poles, whether the state had exercised a reasonable effort to comply with its contract obligation, and whether the delay in removal of utility poles was within the contemplation of the parties at the time the contract was executed, were fact questions for the jury. Defendant also contends that its motion to dismiss the action on the ground that plaintiff was not the real party in interest should have been granted.

The contract, dated May 5, 1955, provides that plaintiff shall complete the work within 75 working days or be subject to certain deductions for damages. It further specifies that upon receipt of written notice from the contractor of the existence of causes over which the contractor has no control which may delay the completion of the work the commissioner of highways may extend the date specified for completion.

The contract is governed by specifications for highway construction issued by the Minnesota Department of Highways, the following of which are relevant here:

1802.1. "All Right of Way for construction work will be furnished by the State. In case the State fails to effect the removal of structures and buildings from any section of the Right of Way, the right is reserved either to eliminate the work on that section from the Contract as provided in 1404, or to require the Contractor to construct the work as specified at a later date. In the latter case, the time for completion of the work will be extended for a period of time equivalent to any delay caused by such failure. If such failure by the State causes increased cost to the Contractor, fair and equitable compensation will be made therefor."

1408. "All obstructions to the construction of the Project and other encumbrances within the construction limits as indicated in the Plans, including fences, foundations and well curbs, *but not including build-*

*ings and public utility properties,* shall be removed by the Contractor." (Italics supplied.)

1409. "All properties of public utility companies or municipalities, such as pole lines, conduits, gas pipes, water pipes, sewers and tile lines, which run over, through or under any part of the Right of Way and which, in the opinion of the Engineer, will interfere with the completion of the Project, will, except as otherwise provided in the Contract, be moved by the owners to the locations and in accordance with the conditions set forth in the utility permit granted by the Commissioner and on file in his office.

"The Contractor shall preserve and protect all such properties which are above the ground surface, and also those below the ground surface whose approximate locations are shown in the Plans * * * he shall assume full responsibility for reimbursing the owners thereof for any damage or injury to such properties which may be caused by his operations. * * *

\* \* \* \* \*

"If the Contractor is required to perform any special work * * * along or adjacent to any public utility property located below the ground surface * * * fair and equitable compensation will be made for the cost of such special work or construction methods."

Defendant concedes that plaintiff had no right to remove the utility poles, such right being vested in defendant alone under Minn. St. 1957, § 161.13, which provided that utility poles constructed, placed, or maintained along any trunk highway:

"* * * may be so maintained or hereafter constructed only in accordance with such regulations as may be prescribed by the commissioner of highways, who shall have power to prescribe and enforce reasonable rules and regulations with reference to the placing and maintaining * * * of the utilities * * *."

Order No. 13095 issued under § 161.13 by the commissioner contains the following regulations:

"11. Existing utility lines may be maintained in their present position until required to change because of the improvement of the trunk

highway, * * *. In all cases the reconstruction of utility lines shall be under permit and in accordance with these regulations.

"12. If at any time the State of Minnesota, acting through its Commissioner of Highways, shall deem it necessary to make any improvements or changes on all or any part of the right of way of the trunk highway which affect the utility as located under a Department of Highways permit, then and in such event, the owner of the utility therein named will, within fifteen days after written notice from the Commissioner of Highways * * * proceed to alter, change, vacate or remove from the trunk highway right of way said public utility so as to conform to said changes, such work to be done without any cost whatsoever to the State of Minnesota and completed within the date specified in said written notice."

Shortly after plaintiff entered into the contract, it also entered into an agreement with Seth Morse and Morse Brothers & Associates, Inc., of Rochester, hereinafter referred to as Morse, which provided that:

"This agreement covers the supervision, the furnishing of the required equipment, tools and other incidental items required to construct, according to the plans and specifications, the State Highway Project, identified as S. P. 6947-06 (S.H. 216).

* * * * *

"1. The St. Paul Dredging Company agrees to employ Mr. Seth Morse on this project as Superintendent of Construction. Both Seth Morse and Morse Brothers & Associates, Incorporated agree to such employment.

"2. * * * Morse Brothers & Associates, Incorporated agree to furnish all of the tools, equipment, labor and materials, job office, tool sheds, and all incidental items required for the complete construction of the project on the basis set forth in paragraphs (3) and (4).

"3. Morse Brothers & Associates, Incorporated agree to deposit $10,000 dollars in the 1st Natl Bank of Minneapolis, Minnesota. This deposit shall be made in the name of/ and the credit of St. Paul Dredging Company and shall hereinafter be referred to as the Operation Fund. * * *

"The original Operation Fund and all other deposits made to this fund cannot be used for any purpose other than to pay the labor, material and other expenses incurred to properly complete the project covered by this agreement.

"All payrolls and all material bills of every description shall be approved by Seth Morse before the checks are issued.

"Payroll checks and all other checks shall be issued in the St. Paul Dredging Company office.

\* \* \* \* \*

"4. The St. Paul Dredging Company agrees to deposit within three days after receipt of the monthly payment from the State Highway Department 95% of each monthly estimate, as well as 95% of the final estimate upon completion of the project.

"If any penalties are assessed against the St. Paul Dredging Company by the State Highway Department for failure to complete the Project within the time limits of the contract, the total amount of such penalties shall be deducted from the 95% due to be deposited in the Operation Fund from the proceeds of the final payment from the State Highway Department.

"Upon completion of the project \* \* \* a check to Morse Brothers & Associates Incorporated for the full amount of the balance remaining in the Operation Fund [shall be issued]."

In opposition to defendant's motion to dismiss the action on the ground that under this agreement with Morse plaintiff was not the real party in interest, H. P. Phelps, president of plaintiff, by affidavit, set forth that:

"\* \* \* whether or not the five per cent (5%) of total payments on the contract, which were to go to St. Paul Dredge, would prove profitable depended on the speed with which the job was accomplished. That any penalties assessed for failure to complete the work on time or the cost of correcting defective work would be the responsibility of St. Paul Dredge. For this reason, St. Paul Dredge wished to, and did in fact, retain control of the job rather than subcontract it. \* \* \*

\* \* \* \* \*

"* * * That under the terms of the rental agreement, St. Paul Dredging Company is obliged to deposit ninety-five per cent (95%) of all moneys received on account of this project in a special account. That the affiant is informed and believes that should St. Paul Dredge fail to diligently assert its claims against the State of Minnesota it would be liable to Morse Brothers and Associates for such failure. That five per cent (5%) of all moneys received on counterclaims against the State of Minnesota are the outright property of the St. Paul Dredging Company."

Work on the highway contract commenced June 1, 1955. At that time there were about 600 utility poles within the right-of-way work-site which belonged to the following companies:

(1) Stuntz Cooperative Light & Power Association
(2) Minnesota Power & Light Company
(3) Northwestern Bell Telephone Company
(4) Northern Electric Cooperative Association
(5) Cherry Cooperative Telephone Company

On March 29, 1955, these companies were notified by defendant that the contract was to be let and that the utility poles would have to be removed. Subsequently, the Department of Highways issued permits to some of the utilities for such removal, but most of the poles remained on the worksite throughout the major part of the time during which plaintiff was required to perform its contract and interfered substantially with its work thereunder.

Prior to commencement of the work, plaintiff's representative advised defendant's project engineer that the construction site was heavily encumbered with poles and asked for delay of the start. This request was referred to the Highway Department which denied it, and plaintiff was compelled to proceed with the work or be subjected to liquidated damages if it were not completed in the 75-day period. On July 18, 1955, defendant's project engineer made the following notation:

"* * * Contractor is working where Power Poles are still in place, the only place left for him to work. Power Co. is moving poles behind contractor where grading is completed, and also moving poles where grading is under way."

From July 25, 1955, to September 17, 1955, plaintiff was almost continuously charged with less than a full working day because of pole-line interference and was working around such poles as late as the week of October 7, 1955. District engineer, Lester Miller, described the pole-line interference as the worst he had seen in his years with the Highway Department and advised his superior:

"There is no question but what the poles were in the way for practically the entire job."

Substantial testimony was submitted by defendant as to reasons occasioning delay in removing the poles, but, as above indicated, the court construed the contract as imposing an absolute obligation upon defendant to remove the poles. It is undisputed that the utility permits issued by the state allowed Stuntz Cooperative Light & Power Association until 30 days prior to completion of the contract to move its poles; allowed Northwestern Bell Telephone Company until August 1, 1955, to remove its poles; and allowed Northern Electric Cooperative Association an undisclosed period of time to remove its poles. It is also undisputed that defendant took no steps to insure removal of the Cherry Cooperative Telephone Company poles after it had been advised by officials of that company that the company did not intend to remove them because of the sale of their properties to Northwestern Bell Telephone Company. The Stuntz poles were not finally removed until June 28, 1955; the Northern Electric poles, not until August 27, 1955; and Northwestern Bell Telephone poles, not until September 19, 1955.

■ We are of the opinion that the trial court's construction of the highway contract was correct. It was silent as to any obligation resting upon plaintiff to remove the poles or to assume responsibility therefor, and under Minn. St. 1957, § 161.13, plaintiff had no right or power to assume such responsibility. The worksite or right-of-way upon which a highway contract is to be performed must of necessity be provided by the state. Specification 1802.1 obligates the state to effect "the removal of structures and buildings from any section of the Right of Way" and imposes upon it the obligation of compensating the contractor for increased costs caused by its failure to perform

this obligation. That the term "structures" must have been intended to include the properties of public utilities maintaining their lines upon public highways is evidenced by Specification 1408 which provides: "All obstructions * * * within the construction limits * * * including fences, foundations and well curbs, *but not including buildings and public utility properties,* shall be removed by the contractor." (Italics supplied.) When 1802.1 and 1408 are construed in relationship to a project such as this, the clear implication to be drawn therefrom is that upon the state alone rests the responsibility for removing poles and other utility properties which might interfere with a contractor's operations, or otherwise to permit a contractor to commence operations at a later date. Here, at the outset of the work, plaintiff notified the state that the poles had not been removed; that they would interfere with the work progress; and requested a delayed date for commencement of operations. The state refused to grant this request and thereby under 1802.1 assumed responsibility for any loss occasioned by plaintiff because of their presence on the worksite.

■ Defendant contends that the specifications cited are subject to modification by Specification 1409 which deals with utility properties. We see nothing in its language which would alter our conclusion as to construction of the contract. It imposes upon the state the direct obligation of requiring removal of public utility poles and lines which would interfere with the performance of a highway project. It places responsibility upon the contractor for any damage occasioned to such properties in the performance of the contract and forbids him to interfere with persons engaged in protecting or removing such utility poles. The implication to be drawn from this specification is that utility properties on the highway worksite which the state is obligated to have removed are not to be considered by the contractor in estimating his costs or submitting his bid. The clear implication of 1409 is that the contractor may safely assume that he will have a construction site free from obstructions including utility poles and that if utility poles are on the site at the time costs are estimated and bids submitted the state will be responsible for their removal. In decisions from other jurisdictions in which similar issues were presented, a like construction was

given to the contracts there involved. Peter Kiewit & Sons' Co. v. State Highway Comm. 184 Kan. 737, 339 P. (2d) 267; Derby Road Building Co. Inc. v. Commonwealth (Ky.) 317 S. W. (2d) 891; see, also, 9 Am. Jur., Building and Construction Contracts, § 16; 12 Am. Jur., Contracts, § 239.

■ It would follow that defendant became liable for plaintiff's damages arising out of defendant's failure to clear the worksite of obstructions even though such failure was not due to a lack of reasonable effort on its part to avoid such a default, or was due to the failure of the utility companies to comply with defendant's requests that the poles be removed. It is well settled that a promise which cannot be performed without the consent or cooperation of a third party is not excused because of the promisor's inability to obtain such cooperation. Lane v. St. Paul Fire & Marine Ins. Co. 50 Minn. 227, 52 N. W. 649, 17 L. R. A. 197; Hokanson v. Western Empire Land Co. 132 Minn. 74, 77, 155 N. W. 1043, 1044, L. R. A. 1917C, 761; City of Minneapolis v. Republic Creosoting Co. 161 Minn. 178, 189, 201 N. W. 414, 419. Here defendant should have required prompt action on the part of the utility companies or otherwise authorized an extension of time for plaintiff's commencement and completion of the contract. It failed to do either and hence bears responsibility for losses sustained in the performance of the contract as a result.

■ Defendant asserts that the trial court erred in denying its motion to dismiss this action upon the ground that plaintiff was not the real party in interest since most of the loss sustained in performance of the contract was borne by Morse. Plaintiff's contract with Morse in no way absolves plaintiff from full responsibility for performance of its contract with defendant. Had plaintiff failed in this respect, defendant could have exacted from it the penalties or damages provided for in the contract. That the measure of payment for the services and equipment provided plaintiff under the Morse contract was based upon a percentage of plaintiff's contract price could not alter plaintiff's obligations to defendant. By the same token, plaintiff should not be barred from suing for losses occasioned by defendant's default, even though such losses were borne by Morse. This is particularly true under

Minn. St. 1957, § 161.03, subd. 17,[1] which provided that the state waives immunity to suits for redress under highway contracts only as to parties in privity with it in such contracts and which accordingly would exclude Morse from bringing an action in its own name for the losses it sustained. If the state's contentions were upheld, the losses sustained in the performance of the contract occasioned by its default could not be recovered either by plaintiff or by Morse. We do not believe that in enacting § 161.03, subd. 17, the legislature intended any such unjust result.

■ Rule 17.01 of Rules of Civil Procedure provides:

"Every action shall be prosecuted in the name of the real party in interest; but * * * a party with whom or in whose name a contract has been made for the benefit of another * * * may sue in his own name without joining with him the party for whose benefit the action is brought."

If, as defendant contends, the Morse contract is a subcontract, then under Rule 17.01 plaintiff, as prime contractor, could sue defendant for the loss sustained by Morse as a result of defendant's defaults. Nothing in this conclusion is inconsistent with the provisions of § 161.03, subd. 17. Further, it finds support in a decision of the United States Supreme Court in a similar situation. Thus, in United States v. Blair, 321 U. S. 730, 737, 64 S. Ct. 820, 823, 88 L. ed. 1039, 1044, the court stated:

"Included in the * * * award of miscellaneous damage was one item of $9,730.27 on a claim to the use of the Roanoke Marble & Granite Company, Inc., a subcontractor of respondent [the prime contractor] who furnished the materials and performed the labor necessary to install the tile, terrazzo, marble and soapstone work called for in respondent's contract with the Government. This award was based

---

[1]Minn. St. 1957, § 161.03, subd. 17, provided: "When a controversy arises out of any contract for the construction or repair to state trunk highways entered into by the commissioner of highways * * * in respect to which controversy the party would be entitled to redress against the state, * * * the state hereby waives immunity from suit in connection with such controversy * * *."

upon extra labor costs incurred under conditions erroneously exacted by the Government superintendent. \* \* \* The \* \* \* subcontract as introduced \* \* \* does not expressly indicate, that respondent was liable to the subcontractor for the acts of the Government upon which the claim was based.

"Clearly the subcontractor could not recover this claim in a suit against the United States, for there was no express or implied contract between him and the Government. Merritt v. United States, 267 U. S. 338. But it does not follow that respondent is barred from suing for this amount. Respondent was the only person legally bound to perform his contract with the Government and he had the undoubted right to recover from the Government the contract price for the tile, terrazzo, marble and soapstone work whether that work was performed personally or through another. This necessarily implies the right to recover extra costs and services wrongfully demanded of respondent under the contract, \* \* \*. Hunt v. United States, 257 U. S. 125."

Defendant cites a number of decisions of the United States Court of Claims which appear contra to the rule in United States v. Blair, *supra,* and based thereon seeks to avoid its effect and applicability here. Such cases include Severin v. United States, 99 Ct. Cl. 435, certiorari denied, 322 U. S. 733, 64 S. Ct. 1045, 88 L. ed. 1567; James Stewart & Co. Inc. v. United States, 105 Ct. Cl. 284, 63 F. Supp. 653; Continental Illinois Nat. Bank & Trust Co. v. United States, 112 Ct. Cl. 563, 81 F. Supp. 596; Pearson, Dickerson, Inc. v. United States, 115 Ct. Cl. 236; Continental Illinois Nat. Bank & Trust Co. v. United States, 121 Ct. Cl. 203, 101 F. Supp. 755, certiorari denied, 343 U. S. 963, 72 S. Ct. 1057, 96 L. ed. 1361; Warren Bros. Roads Co. v. United States, 123 Ct. Cl. 48, 105 F. Supp. 826; F. H. McGraw & Co. v. United States, 131 Ct. Cl. 501, 130 F. Supp. 394; Donovan Const. Co. v. United States, 138 Ct. Cl. 97, 149 F. Supp. 898, certiorari denied, 355 U. S. 826, 78 S. Ct. 34, 2 L. ed. (2d) 39; J. W. Bateson Co. Inc. v. United States, 143 Ct. Cl. 228, 163 F. Supp. 871. Examination of these opinions indicates the formulation of a rule by the United States Court of Claims to the effect that, where a subcontract contains an exculpatory clause absolving the prime contractor

from liability for damages to the subcontractor arising out of delays in the performance of the subcontract occasioned by the fault of the government, the prime contractor may not sue the government for such damage even though the subcontractor be barred from bringing such a suit in his own name. Here the agreement between plaintiff and Morse contains no such exculpatory provision. In most of the decisions cited by defendant is the clear implication that where, as here, the subcontract is silent as to the subcontractor's right to seek redress from the prime contractor, the latter may bring suit against the government for the benefit of the subcontractor.

Affirmed.