775 F.2d 781
 42 UCC Rep.Serv. 172
 The WALDINGER CORPORATION, Plaintiff-Appellee,
v.
CRS GROUP ENGINEERS, INC., CLARK DIETZ DIVISION,
Defendant-Appellant.
The WALDINGER CORPORATION, Plaintiff-Appellant,
v.
ASHBROOK-SIMON-HARTLEY, INC., CRS Group Engineers, Inc.,
Clark Dietz Division, Defendants-Appellees.
 Nos. 83-1925, 83-2037.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 1, 1984.
Decided Oct. 14, 1985.
 
 Frank A. Perrone, Asst. Gen. Counsel for CRS Group Engineers, Inc., Houston, Tex., for defendant-appellant.
 Charles L. Palmer, Franklin, Flynn & Palmer, Champaign, Ill., Larry L. Shepler, Davis, Hockenberg, Wine, Brown & Koehn, Des Moines, Iowa, for plaintiff-appellee.
 Before WOOD, Circuit Judge, PELL, Senior Circuit Judge, and GRANT, Senior District Judge.*
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 In 1977, the Urbana and Champaign Sanitary District was engaged in planning two waste water treatment facilities. CRS Group Engineers, Inc., Clark Dietz Division ("Dietz"), as engineer for the Sanitary District, prepared the specifications for these facilities. Among the equipment necessary for the facilities were belt filter presses.[1] The specifications for these presses detailed two types of requirements--performance capabilities and mechanical components. The Waldinger Corporation ("Waldinger"), a mechanical contractor, preparing to bid on the mechanical portions of the projects, received quotations for sludge dewatering equipment from four belt press manufacturers, including Ashbrook-Simon-Hartley, Inc. ("Ashbrook"). Waldinger successfully bid on the projects and became the mechanical subcontractor; Ashbrook was successful in its bid to be the supplier of the sludge dewatering equipment. Ashbrook, however, was unable to supply the equipment described in the specifications set forth in its contract with Waldinger, and Waldinger obtained the equipment from The Ralph B. Carter Company ("Carter").
 
 
 2
 Waldinger then sued Ashbrook for breach of contract. Ashbrook, in defense, claimed impracticability of performance due to Dietz's intentional or negligent drafting of restrictive specifications. Waldinger also sued Dietz, claiming that Dietz intentionally interfered with the contract between Ashbrook and Waldinger and, alternatively, that Dietz negligently failed to draft proper specifications for the sludge dewatering equipment.
 
 
 3
 Following a bench trial, the district court found that Dietz intentionally prepared exclusionary specifications, and insisted without justification that Ashbrook comply literally with those specifications. The court also found that Ashbrook did not bid with the realization that it could not comply with the specifications. The court concluded as a matter of law that Dietz intentionally interfered with the contract between Ashbrook and Waldinger and that Ashbrook was excused from performing its contract with Waldinger because performance was impracticable. Waldinger v. Ashbrook-Simon-Hartley, Inc., 564 F.Supp. 970 (C.D.Ill.1983).
 
 I.
 
 4
 The district court made the following factual findings, none of which is clearly erroneous, Anderson v. City of Bessemer City, N.C., --- U.S. ----, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). In the summer of 1977, Dietz decided to use equipment manufactured by Carter as the model for the sludge dewatering equipment to be used on the projects, though Dietz had never seen the Carter 15-31 machine perform.[2] Carter supplied the data and performance descriptions which were incorporated in the specifications drawn by Dietz. Dietz took the Carter performance claims at face value, making no independent study of them. Dietz knew that no manufacturer but Carter recycled the belt wash water used in the machine but nevertheless specified that subsystem.[3] Dietz had no data proving that such recycling would increase solid removal or reduce polymer consumption in the sludge dewatering process. Indeed, the evidence adduced at trial showed that recycling had no positive effect on a filter press' production capacities, but likely had a negative effect. Dietz had no scientific basis for including in the specifications other features of the Carter machine, specifically, the 540 square foot dewatering area and the stainless steel clad rollers. The structure designed to house the filter presses was sized to fit the Carter 15-31 machine.
 
 
 5
 In November and December of 1977, Ashbrook contacted Dietz concerning the sludge dewatering equipment to be used in the facilities. Ashbrook subsequently asked Dietz to approve its size 1-V Winkelpress for use on the projects. The evidence established that as early as January, 1978, Dietz had decided to reject the Ashbrook machine. Ashbrook, believing it could meet the performance requirements of the specifications and relying on its experience that specific mechanical subsystems were ordinarily waived by an owner's engineer if a supplier could show that its equipment met performance specifications, bid to supply the sludge dewatering equipment in March, 1978. A March 10, 1978 evaluation prepared by a member of the Dietz design team concluded that Ashbrook's equipment did indeed meet the performance specifications.
 
 
 6
 Subsequently, on April 5, 1978, Dietz retreated from that conclusion, stating that the size 1-V Winkelpress did not have the performance capacity required by the specifications because the machine did not recycle belt wash water. Dietz also questioned the limitation on maintenance space created by the use of an Ashbrook machine in a building designed to house a Carter machine. Dietz stated that it would not approve the machine for use on the projects based upon the information then in its possession. Ashbrook replied that it would provide actual operation data to confirm the machine's capacity and that it would supply equipment that would comply with the specifications.
 
 
 7
 On May 1, 1978, Waldinger issued, and on May 22, 1978 Ashbrook executed, purchase orders under which Ashbrook agreed to furnish the sludge dewatering equipment "in complete accordance with plans and specifications Sec. 11140--sludge dewatering system...." The purchase orders further provided that the equipment furnished by Ashbrook would require the approval of Dietz. Ashbrook, in executing the purchase orders, agreed to furnish the required submittal data for approval by Dietz. General Condition No. 10 of the purchase orders provided as follows:
 
 
 8
 All material and equipment furnished under this Purchase Order shall be subject to the approval of the Owner, architect [or] engineer ..., and Seller shall furnish the required submittal data ... for said approval. In the event such approval is not obtained, this Purchase Order shall be deemed to be cancelled, with no liability on the part of either Purchaser or Seller, unless this Purchase Order is placed with the requirement that the material [or] equipment ... is to be supplied of the type and in such a manner as to meet requirements of plans and specifications. In the latter case the material [or] equipment ... furnished hereunder shall be in strict accordance with plans [and] specifications ..., and Seller shall be bound thereby. In the event the material [or] equipment ... does not meet the foregoing requirements, Seller shall, upon receipt of notice, immediately replace same, or remedy any deficiency, without expense to the Purchaser, and further, Seller shall pay to Purchaser all loss or damage resulting therefrom.
 
 
 9
 At the beginning of the relationship between Ashbrook and Dietz, Dietz requested only performance data on the 1-V machine. Ashbrook set about meeting the production test requirements laid down by Dietz. In August of 1978, Dietz concluded that the 1-V machine met the performance requirements of the specifications. Dietz then demanded performance data on the machine's dewatering capacity with alum sludge. Throughout the testing period, Dietz rejected Ashbrook's performance data as insufficient even though it had no data from Carter. Dietz ultimately rejected the 1-V machine because it did not have proven dewatering capacity with alum sludge; the Carter machine, to the knowledge of Dietz, had never been tested on alum sludge.[4] On November 16, 1978, Dietz discussed with Ashbrook for the first time the mechanical aspects of the Winkelpress, stating that Ashbrook must strictly comply with the mechanical specifications. When Ashbrook notified Dietz that it could not guarantee the machine's performance if built according to Dietz's mechanical specifications, Dietz told Ashbrook not to submit the size 1-V machine again.
 
 
 10
 On December 27, 1978, Ashbrook submitted its proposal for the machine demanded by Dietz but declined to guarantee performance. Ashbrook stated that if Dietz insisted on a drum-type mixer and on recycling the belt wash water Ashbrook could no longer guarantee the required performance with respect to polymer consumption and solids capture. On February 5, 1979, Dietz rejected the Ashbrook proposal and directed Tarlton to submit proposals from other manufacturers. Ashbrook subsequently submitted for approval its size 2-V machine as modified by Dietz, emphasizing its reservations on the suitability of the rotating mixing drum and stainless steel clad rollers. Ashbrook took the position in the numerous discussions that followed that the 2-V machine as modified and approved by Dietz would not meet the performance specifications; its 1-V machine would, however, and it was willing to unconditionally guarantee it. Ashbrook subsequently requested modification of the contract price, claiming that the original specifications had been modified. Dietz refused to recommend that the owner approve the change order, taking the position that the specifications had not been modified. Ashbrook subsequently notified Waldinger that it would not fulfill its contract with Waldinger unless there was modification of the contract price. Finally, on December 3, 1979, Ashbrook notified Waldinger that it was unable to supply the equipment described in the specifications. Waldinger then terminated the purchase orders and obtained the equipment from Carter.[5]
 
 
 11
 The district court found that no manufacturer but Carter could have literally complied with the specifications for the sludge dewatering equipment; that Dietz intended to use Carter equipment on the projects to the exclusion of other manufacturers; that Dietz's decision to use Carter equipment was conscious and in deliberate disregard of the EPA regulation requiring free and open competition, 40 C.F.R. Sec. 35.936-3 (1976); and that there was no scientific or empirical basis for Dietz's insistence on strict compliance with the specifications. The district court further found that Ashbrook did not bid the project with the realization that it could not meet the specifications; rather, relying upon the EPA requirements that specifications foster competition and that specifications not be exclusionary or discriminatory and upon its experience that specific mechanical subsystems are ordinarily waived if a supplier can demonstrate that its equipment meets performance specifications, Ashbrook bid the project believing it could perform. Ashbrook, the district court found, could not have known that Dietz would interpret its specifications in such a way as to require Ashbrook to manufacture a Carter machine.
 
 II.
 
 12
 Waldinger challenges the district court's conclusion that Ashbrook was excused from performing its contract with Waldinger on the ground of commercial impracticability. Ill.Rev.Stat. ch. 26, Sec. 2-615.[6] Assuming the seller has not assumed the greater obligation under the agreement, three conditions must be satisfied before performance is excused: (1) a contingency has occurred; (2) the contingency has made performance impracticable; and (3) the nonoccurrence of that contingency was a basic assumption upon which the contract was made. Luria Bros. & Co. v. Pielet Bros. Scrap Iron, 600 F.2d 103, 111 (7th Cir.1979) (citing Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co., 508 F.2d 283, 293 (7th Cir.1974)). The rationale for the defense of commercial impracticability is that the circumstance causing the breach has rendered performance "so vitally different from what was anticipated that the contract cannot be reasonably thought to govern." Eastern Air Lines, Inc. v. McDonnell Douglas Corp., 532 F.2d 957, 991 (5th Cir.1976). Because the purpose of a contract is to place the reasonable risk of performance upon the promisor, however, it is presumed to have agreed to bear any loss occasioned by an event that was foreseeable at the time of contracting.
 
 
 13
 The applicability of the defense of commercial impracticability, then, turns largely on foreseeability. The relevant inquiry is whether the risk of the occurrence of the contingency was so unusual or unforeseen and the consequences of the occurrence of the contingency so severe that to require performance is to grant the buyer an advantage he did not bargain for in the contract. Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc., 23 U.C.C.Rep.Serv. 1183, 1188 (Minn.1978). If the risk of the occurrence of the contingency was unforeseeable, the seller cannot be said to have assumed that risk. If the risk of the occurrence of the contingency was foreseeable, that risk is tacitly assigned to the seller. Id. The seller's failure to provide a contractual excuse against the occurrence of a foreseeable contingency may be deemed to be an assumption of an unconditional obligation to perform. Id. at 1191. Phrased somewhat differently, if a contingency is foreseeable, the section 2-615 defense is unavailable because the party disadvantaged by the fruition of the contingency might have contractually protected itself. McDonnell Douglas, 532 F.2d at 992; Eastern Air Lines, Inc. v. Gulf Oil Corp., 415 F.Supp. 429, 441 (S.D.Fla.1975).
 
 
 14
 This analysis assumes, of course, that the parties have not restricted the excusing contingencies or eliminated the protection of section 2-615 by imposing upon the seller an absolute contractual duty to deliver. Swift Textiles, Inc. v. Lawson, 18 U.C.C. Rep.Serv. 115, 121 (Ga.Ct.App.1975). If a particular contingency is contemplated and the risk of its occurrence specifically assigned to the seller, foreseeability is not an issue. The parties will be held to their bargain. Glenn R. Sewell Sheet Metal, Inc. v. Loverde, 70 Cal.2d 666, 75 Cal.Rptr. 889, 896 n. 13, 451 P.2d 721, 728 n. 13 (1969) (Traynor, J.).
 
 
 15
 The district court found that a basic assumption of the contract between Waldinger and Ashbrook was that Ashbrook equipment was competitive and would comply with the specifications drafted by Dietz. That assumption was based upon the belief that Dietz would interpret its specifications in a competitive and nonrestrictive manner. Because Dietz did not do so, performance by Ashbrook was rendered impracticable.
 
 
 16
 Waldinger contends that Ashbrook assumed a greater obligation to it under their agreement, an issue not specifically addressed by the district court; specifically, Waldinger argues that Ashbrook unconditionally obligated itself to supply whatever equipment was necessary to meet the specification requirements to the satisfaction of Dietz. In support, Waldinger cites the purchase order in which Ashbrook agreed to furnish equipment "in strict accordance with plans, specifications and general conditions applicable to the contract of Purchaser with the Owner or other contractor." Waldinger further points out that Ashbrook failed to indicate, in the space provided on the purchase order, any specific exceptions to the terms and conditions of the purchase order. Thus, although Ashbrook could have attempted to contractually protect itself by making its obligation to supply the equipment contingent upon Dietz's approval, it did not, and now, according to Waldinger, must be held accountable for its breach.
 
 
 17
 Ashbrook contends that Waldinger views too broadly the scope of the obligation it assumed. Ashbrook argues that it cannot be deemed to have assumed the obligation to meet all mechanical specifications--that is, to build a Carter machine--because Dietz was required, under EPA regulations incorporated in all sub-agreements on EPA projects, 40 C.F.R. Secs. 35.9361(b); 35.937-9(a); 35.938 4(c)(5) (1976), to draft and interpret its specifications in a non-proprietary, non-restrictive manner.[7] There is, Ashbrook contends, an "irreconcilable conflict" between the language of General Condition No. 10 which required it to provide equipment in "strict accordance" with the specifications and the EPA regulations prohibiting specifications drawn to only one manufacturer. Ashbrook apparently argues that it obligated itself to supply equipment that would meet the specifications only insofar as Dietz, in accordance with EPA regulations, drafted and interpreted those specifications in a non-proprietary, non-restrictive manner.
 
 
 18
 Pursuant to the terms of General Condition No. 10 of the purchase orders, the risk of non-approval by Dietz was specifically allocated to Ashbrook. Under those terms, Ashbrook assumed the obligation of providing equipment that strictly complied with the specifications. Although the section 2-615 defense would be unavailable to Ashbrook if this contractual provision stood alone, we are presented with EPA regulations that Ashbrook contends narrow the scope of its otherwise broad contractual obligation to Waldinger. We believe, in light of the express contractual terms prohibiting exclusionary specifications, that Ashbrook obligated itself to provide equipment that would satisfy the specifications when interpreted in a competitive, non-restrictive manner. Ashbrook assumed the risk that it could not supply a machine that satisfied specifications so interpreted, but it did not assume the risk that it could not manufacture a Carter machine. To hold otherwise is to read out of the contract the EPA regulations in which the federal public policy of free and open competition is incorporated. 40 C.F.R. Sec. 35.936-3 (1976). We decline to do so.
 
 
 19
 The district court found that it was not foreseeable at the time of contracting that Dietz would require strict compliance with all specifications. A district court's factual findings may not be overturned unless they are clearly erroneous. Fed.R.Civ.P. 52. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson v. City of Bessemer City, N.C., --- U.S. ----, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). Waldinger has not persuaded us that this finding is clearly erroneous. True, Ashbrook knew that Dietz's approval was required and that at the time it signed the purchase orders Dietz had not expressly approved its 1-V machine. The refusal of an engineer to waive certain mechanical specifications is foreseeable, and a supplier normally assumes the risk of non-approval. But these general principles cannot be deemed to apply where an engineer's insistence on literal compliance with exclusionary specifications has no scientific or rational basis. Given industry practice on waiver of mechanical specifications and the EPA regulations prohibiting exclusionary specifications upon which Ashbrook could rightly rely, Ashbrook could not have foreseen the possibility that Dietz would require it to build a Carter machine even if its machine met the performance specifications. The section 2-615 defense is therefore available to Ashbrook if performance was rendered commercially impracticable by Dietz's insistence upon compliance with the exclusionary specifications.
 
 
 20
 Ashbrook based its claim that performance was commercially impracticable on the evidence that it could not have supplied a filter press that met both the mechanical and performance specifications. Waldinger argues that performance was not commercially impracticable because Ashbrook could have built and supplied a filter press that met Dietz's mechanical specifications. According to Waldinger, Ashbrook's evaluation that the machine would not meet performance standards did not render performance of the contract impracticable because an owner impliedly warrants that the mechanical specifications it furnishes will, if strictly adhered to, permit the contractor to achieve the desired result; the owner, not the contractor, assumes this risk. Bates & Rogers Construction Corp. v. North Shore Sanitary District, 92 Ill.App.3d 90, 94, 47 Ill.Dec. 158, 162, 414 N.E.2d 1274, 1278 (2d Dist.1980).
 
 
 21
 Initially, we note that if the record contains evidence that Ashbrook could have supplied a machine that met both the mechanical and the performance specifications Waldinger has not pointed to it. Ashbrook produced evidence that it could not have supplied such a machine. Because Carter had no 15-31 machine in operation and because Dietz made no independent study of Carter's performance claims, Dietz apparently could offer no concrete evidence that the mechanical filter press it demanded would satisfy the performance standards.
 
 
 22
 Secondly, an owner's implied warranty that its specifications are not defective, the effect of which is to shield the contractor from liability when the machine it builds according to the specifications does not serve the intended purpose, yields to a contrary express contractual provision. Specification 11140 provided that the supplier of the sludge dewatering system was responsible for meeting certain performance standards; if it did not, the owner had the options of reducing the contract price, requiring the supplier to replace the equipment, or waiving the penalty.
 
 
 23
 Under the contract documents, then, Ashbrook was required to guarantee performance. This, the evidence shows, it could not do if required to build its filter press according to Dietz's mechanical specifications. We conclude that Ashbrook's inability to supply a filter press that would both satisfy Dietz's mechanical specifications and perform as required is sufficient to establish that performance of its contract with Waldinger was commercially impracticable.
 
 III.
 
 24
 Waldinger sought to recover damages against Dietz on two tort theories: (1) that Dietz intentionally interfered with the contractual relationship between Waldinger and Ashbrook; and (2) that Dietz, as project engineer, had a duty to perform its contractual obligations to the Sanitary District with ordinary care so as to avoid injury to Waldinger and Ashbrook. We address first the parties' claims of error with respect to the district court's disposition of the intentional interference claim.
 
 
 25
 The district court rejected Dietz's contention that malice in the sense of ill will or an intent to injure is an element of the tort of intentional interference by an architect with the contractual relationships of others, holding that under Illinois law "intentional conduct which brings about the breach with knowledge of the relationship is all that is required." Waldinger, 564 F.Supp. at 979 (citations omitted). Malice in this context, the court determined, means merely purposeful interference without justification. Id. at 980. The court proceeded to find no justification for Dietz's insistence on literal compliance with the mechanical specifications for the sludge dewatering equipment; there was no rational or scientific basis for insistence on literal conformity. Dietz challenges the district court's conclusion that a showing of malice in the sense of ill will or an intent to injure is not required, finding support for its position in this court's decision in George A. Fuller Co. v. Chicago College of Osteopathic Medicine, 719 F.2d 1326 (7th Cir.1983), rendered several months after the district court's decision in this case.
 
 
 26
 In Fuller, we explained that, "as a general rule, the element of malice does not require ill will, hostility, or an intent to injure." Id. at 1332. The plaintiff need only assert that the defendant acted "intentionally and without just cause." Id. (citing Amalgamated Financial Corp. v. Atlantis, Inc., 105 Ill.App.3d 379, 61 Ill.Dec. 264, 434 N.E.2d 417 (1982)). Although there is a general duty to refrain from interfering with the contractual relationships of others, justification for intentional acts of interference exists "where the third party acts to protect a conflicting interest which is considered to be of equal or greater value than that accorded the contractual rights involved." Id. quoting Schott v. Glover, 109 Ill.App.3d 230, 234, 64 Ill.Dec. 824, 827, 440 N.E.2d 376, 379 (1st Dist.1982). The fiduciary duty owed by an attorney to his client is such an interest, id., as is the fiduciary duty owed by a corporate officer to his corporation. Swager v. Couri, 77 Ill.2d 173, 32 Ill.Dec. 540, 395 N.E.2d 921 (1979). Attorneys and corporate officers are privileged to act to protect the best interests of their clients and corporations, respectively.
 
 
 27
 Where a conditional privilege exists, the plaintiff, to succeed on a claim of tortious interference with contract, must allege and prove that the agent's intentional acts were not taken to further its principal's best interests, but to further its personal goals or to injure the other party to the contract. Fuller, 719 F.2d at 1333; Schott, 109 Ill.App.3d at 235, 64 Ill.Dec. at 828, 440 N.E.2d at 380. Such a showing must also be made to defeat an architect's conditional privilege to interfere with the construction contract of its principal, a privilege we have determined Illinois courts would recognize. Fuller, 719 F.2d at 1333. If an architect induces a breach of contract not to further its principal's best interests but with the intent to harm the other party to its principal's contract or to further its personal goals, the architect is liable for tortious interference with the contract.
 
 
 28
 Although we did not hold in Fuller that an architect is conditionally privileged to interfere with a contract to which its principal is not party,[8] we cited Ballou v. Basic Construction Co., 407 F.2d 1137 (4th Cir.1979), as a supporting example of recognition of a "privilege on behalf of architects while performing their contractual duties." Fuller, 719 F.2d at 1334. In Ballou, a subcontractor charged that the project architects had intentionally interfered with and induced a breach of the subcontractor's contract with the general contractor by rejecting concrete columns it had supplied for failure to conform with contract specifications. Under both the prime contract between the architects' principal and the general contractor and the subcontract between the general contractor and the subcontractor, the architects had the right to determine the acceptability of the work, subject to arbitration. The court of appeals approved of the district court's conclusion that
 
 
 29
 [u]nder the contract the architects exercised a quasi-judicial function in accepting or rejecting work and that they were therefore immune from suit for their decision to reject the noncomplying columns unless [the subcontractor] could show that fraud or bad faith motivated the decision.
 
 
 30
 Ballou, 407 F.2d at 1141 (citations omitted). The court added that, although "the architects' decision to enforce literal compliance with the contract may have reflected poor judgment or excessive rigidity," there was no evidence that the decision was motivated by malice or bad faith. Id. Thus, Ballou suggests that an architect's conditional privilege[9] extends beyond contracts to which its principal is a party. See also Kecko Piping Co., Inc. v. Town of Monroe, 172 Conn. 197, 374 A.2d 179 (1977).
 
 
 31
 Waldinger and Ashbrook argue that an architect is not conditionally privileged, while performing its contractual duties to interfere with subcontracts. It would make little sense to recognize an architect's conditional privilege, while performing its contractual duty to enforce compliance with contract specifications, to interfere with the contract of its principal to further its principal's best interests and concomitantly decline to recognize a conditional privilege to enforce compliance with those same specifications when they are incorporated in a subcontract. We hold that Dietz was conditionally privileged to interfere with the contract between Ashbrook and Waldinger.
 
 
 32
 As we have made clear, the privilege is not absolute. The plaintiff may defeat the privilege by establishing that the defendant was acting other than in accord with his contractual obligations to his principal. Where an architect's action in enforcing literal compliance with contract specifications was not justifiable in that it was not necessary to protect his principal's conflicting interests, but rather was taken with an intent to further his personal goals or to injure the party which is thereby forced to breach its contract with the plaintiff, the element of actual malice exists and the architect is liable for tortious interference.
 
 
 33
 Implicit in the district court's conclusion that there was no justification for Dietz's insistence on literal compliance with the restrictive mechanical specifications is its finding that Dietz's action was not necessary to protect the Sanitary District's best interests. Because a conditional privilege on behalf of an architect had not yet been recognized at the time of the district court's decision, it did not expressly determine whether Dietz's insistence on literal compliance was intended to further its personal goals or to injure Ashbrook. Based upon the findings the court made it is possible that the court, had it deemed it necessary to address the issue, would have also found that Dietz intended to injure Ashbrook or to further its personal goals. Malice may be implied from the district court's findings that Dietz had made a decision to reject Ashbrook even before the March, 1978 evaluation which concluded that the Ashbrook machine met the performance specifications and that during the shop drawing submittal stage Dietz was reassuring Carter that Dietz would require rigid compliance with the specifications. Because it is not within our province to make this ultimate determination, we find it necessary to remand for a factual finding whether Dietz acted with the requisite malice. If on remand the district court finds that Dietz's insistence on strict compliance with the exclusionary specifications was intended to injure Ashbrook or to further Dietz's personal goals, liability will attach.
 
 
 34
 We affirm the district court's conclusion that Waldinger's damages are recoverable under the theory of intentional interference with contract.[10] Although the district court apparently viewed element number (4) as an economic loss and the remaining elements of damages as "direct losses," see n. 10, we believe the Illinois definition of "economic loss" encompasses all damages claimed by Waldinger:
 
 
 35
 "Economic loss" has been defined as "damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits--without any claim of personal injury or damage to other property...."
 
 
 36
 Moorman Mfg. Co. v. National Tank Co., 91 Ill.2d 69, 82, 61 Ill.Dec. 746, 752 435 N.E.2d 443, 449 (1982). Moorman makes clear that the term "economic loss" includes both direct loss, measured by the costs of replacement or repair, and consequential loss, including the loss of profits. 91 Ill.2d at 83, 61 Ill.Dec. at 752, 435 N.E.2d at 449. We agree, however, that Moorman's prohibition of the recovery of economic loss in a negligence action does not preclude the recovery of economic losses here.
 
 
 37
 In Moorman, the Court, noting that tort law is designed to protect the interest in freedom from physical harm to both person and property, refused to permit recovery in a negligence or strict liability action of economic losses, that is, injuries suffered as a result of disappointed commercial expectations. The Court noted two exceptions to its general rule barring recovery of economic losses in tort: intentional and negligent misrepresentations. Although the Court did not articulate its reasons for excepting these torts, it presumably did so because the interest protected by these torts is an economic one. See W. PROSSER, LAW OF TORTS Sec. 110 (4th ed. 1971). Through the defendant's misrepresentation, the plaintiff has not received the benefit of his bargain. We fully agree with the district court that because "the interest protected [by the tort of intentional interference with a contractual relationship] is the reasonable expectation of economic advantage," O'Brien v. State Street Bank & Trust Co., 82 Ill.App.3d 83, 85, 37 Ill.Dec. 263, 265, 401 N.E.2d 1356, 1358 (4th Dist.1980), economic losses are recoverable.
 
 
 38
 If on remand the district court finds that Dietz did not intend to injure Ashbrook or to further its personal goals, it will be required to reexamine the remaining basis for liability--Dietz's negligence. The court, if it finds it necessary to address this issue, will find guidance in several recent Illinois decisions, rendered after its decision in this case, involving the issue whether the Moorman doctrine applies to negligence actions against architects and engineers. Bates & Rogers Construction Corp. v. North Shore Sanitary District, 128 Ill.App.3d 962, 84 Ill.Dec. 149, 471 N.E.2d 915 (2d Dist.1984); Rosos Litho Supply Corp. v. Hansen, 123 Ill.App.3d 290, 78 Ill.Dec. 447, 462 N.E.2d 566 (1st Dist.1984); Palatine National Bank v. Charles W. Greengard Associates, Inc., 119 Ill.App.3d 376, 74 Ill.Dec. 914, 456 N.E.2d 635 (2d Dist.1983). See also Ferentchak v. Village of Frankfort, 105 Ill.2d 474, 86 Ill.Dec. 443, 475 N.E.2d 822 (1985).
 
 
 39
 In conclusion, we affirm the district court's determination that Ashbrook was excused from performing its contract with Waldinger on the ground of commercial impracticability and its determination that Waldinger could recover its economic losses under the theory of intentional interference with contract. We remand, however, for a determination whether Dietz acted with the "malice" necessary to establish that it intentionally interfered with the contract between Waldinger and Ashbrook. With the exception of the negligence claim against Dietz, which the district court may or may not find it necessary to address, we find all remaining issues to be without merit. Circuit rule 18 shall not apply. Each party shall bear its own costs.
 
 
 40
 PELL, Senior Circuit Judge, concurring in part and dissenting in part.
 
 
 41
 I concur in the majority opinion except insofar as this court is affirming the district court's determination that Ashbrook was excused from contractual performance on the ground of commercial impracticability. I respectfully dissent from that portion of the opinion.
 
 
 42
 In final analysis this is simply a case where a subcontractor apparently anxious to secure a contract, although knowing that he could not meet all of the requirements of that contract, nevertheless was willing to take a chance that it could vary the terms. In this case the effort was not successful and Ashbrook should also be responsible for damages to Waldinger.
 
 
 43
 The majority opinion accepts the district court's findings of fact as being not clearly erroneous. I cannot agree. Thus a finding that Ashbrook did not bid the project with the realization it could not meet the specifications simply is not supported by the record. Further, it is not clear to me whether there was any evidence in the trial that Ashbrook relied upon the EPA's requirements that specifications foster competition or whether this is merely a post hoc argument advanced by Ashbrook after it found itself in a trial. Ashbrook may have relied upon its experience that specific mechanical subsystems are ordinarily waived if a supplier can demonstrate that its equipment can meet performance specifications but here Ashbrook had no basis for calling that experience into play. There was nothing in the specifications authorizing an "equal" substitute. I am at a loss to find support for the district court's finding that Ashbrook could not have known that Dietz would interpret its specification in such a way as to require Ashbrook to manufacture a Carter machine.
 
 
 44
 On the reverse side of the purchase orders, at the top of the page in capital letters, Ashbrook was admonished that "SELLER MUST INDICATE IN WRITING THE SPECIFIC EXCEPTIONS, IF ANY, TO THE TERMS AND CONDITIONS OF THIS PURCHASE ORDER." Ashbrook executed the purchase order as written. No exceptions to the purchase order were taken by Ashbrook. I fail to comprehend why Ashbrook did not here assume a "greater obligation." The plain situation was that there was an unconditional obligation to Waldinger, under the circumstances and the contract documents, to provide the materials necessary to satisfy the specification requirements to the approval of the engineer. Ashbrook knew at the time it signed the Purchase Orders that the Engineer had expressly not approved acceptability of its 1-V machine to satisfy the performance specifications and knew its subsystem parts were sufficiently different that a waiver of the specifications by the engineer on six separate items would be required. Ashbrook admittedly made the business decision to bid the project under those circumstances, without exculpatory language in the contract. Its decision to do so under those known contingencies was not in accord with custom in the industry, which according to the evidence would be to submit a bid identifying your equipment as an "or equal."
 
 
 45
 While I regard Sec. 2-615 as not being applicable, even in the event it were, a person seeking its shelter must establish that performance was "impracticable." In Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co., 508 F.2d 283 (7th Cir.1974), this court stated in denying a defense of commercial impracticability:
 
 
 46
 The fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused. Id. at 293.
 
 
 47
 We will not allow a party to a contract to escape a bad bargain merely because it is burdensome. After one party has entered a contract for supply, he ceases to look for other sources and does not enter other contracts. Id. at 294.
 
 
 48
 Further, Ashbrook has completely failed to prove that its loss if it had complied with the specification would have been excessive or unreasonable. The district court properly did not find this to be the case. In applying Section 2-615 to the circumstances of a case, the courts have uniformly held that the specific contingency which occurred need not have been contemplated but only that the occurrence be in some degree forseeable. See, e.g., Bende & Sons, Inc. v. Crown Recreation, Inc., 548 F.Supp. 1018 (E.D.N.Y.1982), aff'd without opinion, 722 F.2d 727 (2d Cir.1983).
 
 
 49
 In the present case, refusal of the engineer to agree to waive all or part of the mechanical specifications in interpreting compliance with the project specifications, could have been foreseen as a distinct possibility that would affect performance.
 
 
 50
 Ashbrook contends it is excused from performance because it did not obtain the expected performance from the Engineer. Ashbrook, however, was aware of the fact that its desired performance of the contract would be possible only to the extent that it was able to obtain the consent or cooperation of the Engineer.
 
 
 51
 An agreement which cannot be performed without the consent or cooperation of a third-party is not excused by reason of the inability of the promisor to obtain such consent or cooperation. St. Paul Dredging Company v. State, 259 Minn. 398, 107 N.W.2d 717 (1961); Morin Bldg. Products Co. v. Volk Const., Inc., 500 F.Supp. 82 (D.Mont.1980); and Security Sewage Equipment Co. v. McFerren, 14 Ohio St.2d 251, 237 N.E.2d 898 (Ohio 1968).
 
 
 52
 Waldinger bargained with Ashbrook to receive sludge dewatering equipment which would meet the specifications and receive the Engineer's approval, without restriction or limitation as to source of supply. Whether the necessary equipment was manufactured by Ashbrook in whole or in part or by other suppliers was of no consequence to Waldinger. It offered that contract in the form of two purchase orders to Ashbrook. Ashbrook accepted the contract on those terms without reservation or exception.
 
 
 53
 Ashbrook contends performance was impossible because the equipment required by the engineer in satisfaction of the specifications could not (in Ashbrook's opinion) have performed and, therefore, Ashbrook would have become subject to those provisions of the contract which required Ashbrook to repair or replace equipment which did not satisfy the performance specifications. The law of Illinois is clearly to the contrary. If Ashbrook had supplied the equipment under its approved drawings, and that equipment did not satisfy the performance specifications by reason of the fact that the approved and specified equipment being supplied could not meet the performance specifications, as contended by Ashbrook, then Ashbrook would be excused from operation of the penalty provisions. Bates & Rogers Const. Corp. v. North Shore Sanitary Dist., 92 Ill.App.3d 90, 94, 47 Ill.Dec. 158, 162, 414 N.E.2d 1274, 1278 (1980). In W.H. Lyman Const. Co. v. Village of Gurnee, 84 Ill.App.3d 28, 35, 38 Ill.Dec. 721, 727, 403 N.E.2d 1325, 1331 (1980), a clause under which the contractor would be held responsible for suitability of the materials supplied in accordance with the specifications was expressly negated by the Court. Id. at 37, 403 N.E.2d at 1332.
 
 
 54
 Regardless of the ultimate allocation of responsibility between Ashbrook and Dietz, Ashbrook, in my opinion, should be held accountable to Waldinger under the terms of its contract with Waldinger.
 
 
 
 *
 The Honorable Robert A. Grant, Senior District Judge of the Northern District of Indiana, is sitting by designation
 
 
 [1]
 The function of a belt filter press is to remove waste solids from the waste water. The district court explained the manner in which it accomplishes this goal:
 Sewage enters the belt filter press as a slurry of solids and water. The slurry is mixed with polymers, organic compounds which cause the solids in the slurry to floculate. The floculated sludge is deposited in a section of the machine where gravity dewatering takes place and excess water drains off from the floculated sludge. The floculated sludge is then fed into a shear press section of the machine where more water is extracted by shear pressure and the sludge emerges from the filter press as a friable, cake solid.
 Waldinger v. Ashbrook-Simon-Hartley, Inc., 564 F.Supp. 970, 973 (C.D.Ill.1983).
 
 
 [2]
 At the time the specifications were drafted, Carter had no 15-31 machine in operation
 
 
 [3]
 Carter has since returned to its pre-1975 flat belt press design and no longer manufactures a machine that recycles belt wash water
 
 
 [4]
 In the interim between the letting of the bids and the rejection of the Ashbrook machine, Dietz was reassuring Carter that Dietz would insist on rigid adherence to the specifications. Carter expressed the hope that the "successful manufacturer" would be required to meet all process requirements
 
 
 [5]
 Carter ceased manufacturing the 15-31 machine in February, 1978 and began manufacturing instead the 15-32 model. This machine, which Waldinger was required to install, was too large for the structure designed to house the 15-31 machine. The building had to be redesigned to accommodate the 15-32 machine
 
 
 [6]
 Sec. 2-615. Excuse by Failure of Presupposed Conditions
 Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
 (a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.
 Ill.Rev.Stat. ch. 26, Sec. 2-615 (1963).
 
 
 [7]
 The EPA regulations to which Ashbrook refers read as follows:
 (a) Nonrestrictive specifications.
 (1) No specification for bids or statement of work in connection with such works shall be written in such a manner as to contain proprietary, exclusionary, or discriminatory requirements other than those based upon performance, unless such requirements are necessary to test or demonstrate a specific thing or to provide for necessary interchangeability of parts and equipment, or at least two brand names or trade names of comparable quality or utility are listed and are followed by the words "or equal." ... With regard to materials, if a single material is specified, the grantee must be prepared to substantiate the basis for the selection of the material.
 (2) Project specifications shall, to the extent practicable, provide for maximum use of structures, machines, products, materials, construction methods, and equipment which are readily available through competitive procurement, or through standard or proven production techniques, methods, and processes....
 (b) Sole source restriction.
 (1) A specification shall not require the use of structures, materials, equipment, or processes which are known to be available only from a sole source, unless such use has been adequately justified in writing by the grantee's engineer as meeting the minimum needs of the particular project....
 
 
 [40]
 C.F.R. Sec. 35.936-13(a), (b) (1976)
 (a) The grantee must avoid ... noncompetitive procurement practices which restrict or eliminate competition or otherwise restrain trade.
 
 
 [40]
 C.F.R. Sec. 35.936-16(a) (1976)
 
 
 [8]
 We had no occasion to address this issue; we found that the general contractor had not stated a claim against the architect for intentional interference with the contract between the general contractor and its subcontractors because no resulting breach of the contract was alleged. Fuller, 719 F.2d at 1330-31
 
 
 [9]
 Although Ballou refers to quasi-judicial immunity, we prefer the term qualified privilege. In exercising its responsibility to determine the acceptability of equipment, the architect is acting on behalf of the owner, not as an impartial judge of a dispute between any two participants in the construction process
 
 
 [10]
 The district court awarded damages as follows
 (1) Increased cost to purchase
 Carter equipment: $284,123.00
 (2) Additional engineering fees
 paid to Dietz for consideration
 of the Carter equipment: 5,075.00
 (3) Additional fees paid to Tarlton
 to construct a platform to
 move the Carter machine into
 the building: $ 15,008.00
 (4) Waldinger's loss of use of
 funds through the additional
 expense of purchasing Carter
 equipment: 64,249.00
Total damages: $368,455.00